**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

BADAR KHAN SURI

     *Petitioner*,

v.

DONALD TRUMP, *et al.,*

     *Respondents.*

Case No. 1:25-cv-480

**ORAL ARGUMENT**
**REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR RELEASE ON BOND**

## INTRODUCTION

Petitioner Badar Khan Suri is a postdoctoral fellow and scholar at Georgetown University, a dedicated husband to a U.S. citizen wife, and a devoted father to three young children. The United States government has made no specific allegation of wrongdoing against Dr. Khan Suri, nor does Dr. Khan Suri have any criminal history. He has been imprisoned and targeted for potential deportation for his protected political speech and because he is married to an American woman with ties to Gaza. After arresting him at home in Rosslyn, Virginia, shackling and jailing him as he was returning home from a traditional evening Ramadan meal celebration, and holding him without the ability to communicate with his wife, children, and attorneys, federal agents then transported Dr. Khan Suri to multiple detention centers and staging facilities across multiple state lines, ultimately warehousing him in a crowded, lockdown unit in Prairieland Detention Center in Alvarado, Texas. As a result of the federal government's actions, Dr. Khan Suri has lost his freedom, his ability to practice his deeply held religious beliefs, his ability to have meaningful access to his legal counsel and this Court, his professional credibility, reputation, and employment opportunities, and perhaps most deeply personal of all, he is experiencing the ongoing separation from his wife and three young children.

President Donald J. Trump and his administration have made plainly clear the grounds for their hostility against Dr. Khan Suri: his and his wife's speech and expression related to Israel's military campaign in Gaza and his wife's father's former involvement with the Gazan government, more than a decade before the events of October 7, 2023. President Trump and his administration have also made clear their intention to target people who express support for the Palestinian people by deeming them "terrorist sympathizers" or people "engaged in pro-terrorist, anti-Semitic, anti-American activity." By targeting Dr. Khan Suri and others with similar speech, the federal

2

government's actions have had an immediate and palpable chilling effect on political debate, with many noncitizens across the country living in fear that they too will be targeted if their actual or imputed speech or association draws the ire of the administration.

This case raises serious and important constitutional and statutory questions that deserve a thorough and fair adjudication. But a full and fair adjudication is not possible if Dr. Khan Suri is forced to endure the very retaliatory and punitive harms he is challenging during the pendency of this case. To release Dr. Khan Suri at the end of what may prove to be a long and protracted legal proceeding will be a hollow victory—many of the harms this litigation seeks to prevent will have already happened.

This Court has the power, pursuant to its inherent authority, to release Dr. Khan Suri pending the adjudication of this habeas petition. *See, e.g., Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *15 (D. Md. Sept. 18, 2020) ("It is firmly established, however, that federal courts have inherent authority to grant bail to habeas petitioners, even absent express statutory authority"); *Young v. Antonelli*, No. CV 0:18-1010-CMC, 2021 WL 62573, at *1 (D. S.C. Jan. 7, 2021) ("This court has the inherent authority to grant release on bond to a habeas petitioner who . . . warrants immediate relief and release"); *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001); *Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986); *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (holding that on a claim of illegal detention, "the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief pendente lite, to grant bail or release, pending determination on the merits"); *United States v. Eliely*, 276 F. App'x 270, 270 (4th Cir. 2008) (referencing the standard for release on bail of a prisoner pending a collateral attack on the conviction). The authority to release a habeas petitioner *pendente lite* ensures that the writ of habeas corpus remains an effective remedy under extraordinary circumstances. *Mapp*, 241 F.3d

at 230. It is hard to imagine a more extraordinary set of circumstances than what Dr. Khan Suri, his U.S. citizen wife, and their three young children have endured. Moreover, Dr. Khan Suri is not a flight risk or danger to the community— to the contrary, Dr. Khan Suri has deep community ties and numerous people who attest to his character and commitment to peace. This Court should grant Dr. Khan Suri's immediate release.

## **FACTS**

### I.    DR. KHAN SURI'S LIFE AND COMMUNITY TIES IN THE UNITED STATES

Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India and has devoted his life to his academic pursuits. *See* ECF No. 6-1, Decl. of Mapheze Saleh ("Saleh Dec.") at ¶¶6, 8.[1] Dr. Khan Suri is considered an interdisciplinary scholar whose areas of interest are religion, ethnic conflicts, and peace processes in the Middle East and South Asia. He received his undergraduate degree in humanities and a master's and Ph.D. in Peace and Conflict Studies from the Nelson Mandela Centre for Peace and Conflict Resolution at Jamia Millia Islamia in New Delhi. He wrote his thesis on "Transitional Democracy, Divided Societies and Prospects for Peace: A Study of State Building in Afghanistan and Iraq," in which he explored the complexities of introducing democracy in ethnically diverse societies. He has traveled extensively to international conflict zones, including to India, Pakistan, Iran, Turkey, Syria, Lebanon, Egypt, and Palestine.[2]

In 2011, Dr. Khan Suri was on an international humanitarian convoy to Gaza when he met his now wife, Mapheze Saleh, a Missouri-born, U.S. citizen living in Gaza at that time. Saleh Dec. at ¶6. Dr. Khan Suri was pursuing his master's degree at Jamia Millia Islamia then, and he was traveling to a conflict region as part of his program. Ms. Saleh was serving as a translator for

---

[1] *See also*, Ex. 1, Declaration of Hassan Ahmad (verifying factual statements pertaining to Dr. Khan Suri).
[2] Dr. Khan Suri's academic and scholarly profile for Georgetown University can be found at https://acmcu.georgetown.edu/profile/badar-khan-suri/.

foreign delegations that visited Gaza and was the translator for his convoy. During that trip, the humanitarian convoy may have met with Ms. Saleh's father, who was the head of an organization called The House of Wisdom that worked on peace and conflict resolution; however, since Dr. Khan Suri was only a student, he was not introduced to Ms. Saleh's father.[3] Dr. Khan Suri returned to Gaza several years later to ask for his wife's father's hand in marriage. That is the full extent of Dr. Khan Suri's meetings with Ms. Saleh's father. *Id*. at ¶7. Likewise, Dr. Khan Suri's telephone conversations with Ms. Saleh's father were infrequent—the last one of which was well over a year ago—and limited to pleasantries, holiday greetings, and the occasional check-in from his father-in-law to encourage him to study hard and publish.

Dr. Khan Suri and Ms. Saleh married in 2013 in New Delhi, India, while he completed his Ph.D. at Jamia Millia Islamia. *Id*. at ¶ 8. They had three children, born in 2016 and 2019. Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University, and in 2022, he was granted a J-1 visa to continue his doctoral research on peacebuilding in Iraq and Afghanistan at the Center for Muslim-Christian Understanding at Georgetown's Walsh School of Foreign Service. *Id*. at ¶ 10. The family was excited to move to the United States for Dr. Khan Suri's career opportunities and for the country's protections for free speech and religious freedom. They looked forward to enrolling their children in American schools and raising them in an environment where their beliefs and religious practices were respected. *Id*. at ¶ 9. Prior to his arrest and detainment, Dr. Khan Suri was working on a project that examined potential causes that hinder cooperation among religiously diverse societies and possibilities to overcome those hindrances, and he was teaching a class on conflict resolution in South Asia. *See* Georgetown University, Walsh School of

---

[3] Dr. Khan Suri and his wife's recollections diverge on whether he met Ms. Saleh's father on his first trip to Gaza. Dr. Khan Suri remembers meeting her father for the first and only time when he returned to Gaza for their engagement.

Foreign                Service,                *Spring                2025*,                available                at
https://acmcu.georgetown.edu/academics/courses/spring-2025/. Dr. Khan Suri hoped to continue publishing and engage in a career of research and teaching in the U.S.

Dr. Khan Suri has developed a significant and diverse community of support in the U.S., including his U.S. citizen wife, the Dean of the School of Foreign Service at Georgetown University and his professional colleagues, his students, his religious community, and his friends, who all can attest to his character and commitment to peace. *See* Ex. 2, Letters of Support for Badar Khan Suri ("Letters of Support"). Dr. Khan Suri's community maintains that he "fosters discussions with students from various backgrounds to hear their perspectives," has a "sincere interest in democracy as the model structure for modern societies," and "enacts his commitment to peace not only in his research and interactions with colleagues, but also within his own family." *Id.* Dr. Khan Suri has no criminal record and has never been charged with a crime. As a scholar of religion, ethnic conflict and peace processes, and the husband of a person with Palestinian heritage, Dr. Khan Suri felt like he had an obligation to share his concerns about Israel's systemic violence against Palestinians in Gaza on his social media platforms. But even in this context, his colleagues describe his focus on "the need to end wars, find just solutions to conflicts, and better the world." *Id.* Dr. Khan Suri is not an activist and never participated in any protest or other advocacy activities. He came to this country to work and raise his family, and he was doing both without incident until his arrest on March 17, 2025. Dr. Khan Suri's speech regarding the human rights of Palestinian people and related issues are matters of public concern clearly protected by the First Amendment. Like many other people advocating for Palestinian rights, Dr. Khan Suri's wife has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. Given his association with his wife, Dr. Khan Suri has also been targeted by Islamophobic media

6

campaigns, and now by the U.S. government. But until recently, he believed that the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or removing him from the country, even if powerful government officials disagreed with his viewpoints.

## II.    DR. KHAN SURI'S ARREST, BOOKING, AND TRANSFER

On Monday, March 17, at approximately 9:20 p.m., Dr. Khan Suri was returning from teaching at Georgetown and attending an Iftar dinner. Saleh Dec. ¶ 13. When he arrived at his apartment building in Rosslyn, Virginia, approximately three individuals in masks and grey fatigues approached Dr. Khan Suri as he was about to enter his building and asked: "Are you Badar?" When Dr. Khan Suri replied in the affirmative, the men stated, "You are under arrest, and your student visa is revoked." Dr. Khan Suri responded that he was not on a student visa; he was a professor on an exchange visa. "Same thing, we are revoking your exchange visa," the officer stated. Dr. Khan Suri asked the officer why he was being arrested but was told he would find out later. During this initial exchange, Dr. Khan Suri managed to call his wife to come outside, telling her he was under arrest outside of their apartment. *Id*. When Ms. Saleh came outside, she witnessed three uniformed men with masks over their noses and mouths handcuffing Dr. Khan Suri and placing him in a large black SUV. Dr. Khan Suri continued to ask the officers for a reason for his arrest. "Social media," an officer finally responded. When Dr. Khan Suri's wife inquired further, the agents stated they were with Homeland Security, revoking his visa and taking him to Chantilly, Virginia, to the ICE Field Office. Dr. Khan Suri asked his wife to get his passport and immigration documentation from inside the apartment. When his wife returned with the paperwork, she was not allowed to hand him the documents, but they were taken by the agents themselves prior to departing. *Id.*

While in transit to Chantilly, Dr. Khan Suri continued to press the officers for answers. One of the officers explained that someone at a very high level at the Secretary of State's office did not want him to be in the country. He told Dr. Khan Suri that his visa had been revoked days prior, and they planned to deport him that day.

Approximately two hours after his arrest, Dr. Khan Suri telephoned his wife from one of the agent's phones. Saleh Dec. ¶ 14. He was being held at the ICE Washington Field Office in Chantilly, Virginia. He told his wife he was being taken to Farmville Detention Center several hours away in Farmville, Virginia, and that he had a hearing in Texas scheduled for May 6. He also told her he was being held under Section 237 (a)(4)(C) of the Immigration and Nationality Act. *Id.*

That same night, a colleague informed attorney Hassan Ahmad ("Attorney Ahmad") about Dr. Khan Suri's arrest. Attorney Ahmad did not know Dr. Khan Suri, but he offered to help immediately. Ex. 1 at ¶¶ 3-6. Because Dr. Khan Suri was previously unrepresented, it took until the next morning for more details about him to reach Attorney Ahmad. At 1:52 p.m., Attorney Ahmad was able to speak directly with Ms. Saleh. She shared enough information about her husband and his immigration case for Attorney Ahmad to file a notice of appearance (Form E-28) with the immigration court at 2:11 p.m. By entering his appearance in Dr. Khan Suri's immigration case, not only did he give notice to ICE counsel that he was representing Dr. Khan Suri, but he was able to view Dr. Khan Suri's immigration court documents, including the Notice to Appear. *Id.* at ¶¶ 7, 8. After confirming the immigration charges against Dr. Khan Suri, Attorney Ahmad began drafting the habeas petition in this case. ECF No. 1. Throughout the day of March 18, Attorney Ahmad and the other attorneys assisting him checked the ICE Detainee Locator ("ICE Locator") repeatedly to locate Dr. Khan Suri; however, he did not appear in the system until March 19, 2025. *See* Ex. 3, ICE Locator Search Results.

Around 11:30 p.m. the night of his arrest, Dr. Khan Suri was driven from the ICE Washington Field Office to the Farmville Detention Center in Farmville, Virginia, arriving in the early morning hours of Tuesday, March 18. While there, he repeatedly requested to contact his wife to let her know where he was. His pleas were all ignored. Sometime later that afternoon, he was driven to an ICE facility in Richmond, where he was chained to a bench for several hours—without food, water, or access to the restroom. Next, Dr. Khan Suri was placed in full restraints, crowded into a van with several other detainees, and driven to an airport.

On the night of March 18, after the habeas petition was filed on his behalf, Dr. Khan Suri attempted to call his wife, but all she heard on the other line was a recorded message explaining who was calling and where they were calling from. Dr. Khan Suri was being held at the Alexandria Staging Facility, a privately operated removal facility on the site of the Alexandria, Louisiana airport. The facility serves as a 72-hour holding site prior to an individual's removal from the country. Dr. Khan Suri remained there for three days. In those three days, he spoke to his wife only once, on the morning of March 20, expressing grave concern for her and their three children. He also shared that it was difficult to be away from his family during the holy month of Ramadan and that he was not receiving meals in accordance with his fasting schedule at the Alexandria Staging Facility. Saleh Dec. ¶ 15.

In the late afternoon on Friday, March 21, 2025, Dr. Khan Suri was driven by van to Prairieland Detention Center in Alvarado, Texas. He arrived at about 8 p.m., and because he was fasting, he asked for food but was denied. Dr. Khan Suri has remained there since.

Dr. Khan Suri's wife, Ms. Saleh, is now forced to be the sole caretaker of their three young children and, therefore, cannot travel to Texas to see Dr. Khan Suri. Saleh Dec. ¶ 19.

9

On March 19, DHS spokesperson Tricia McLaughlin said in a post on the social media platform X that Dr. Khan Suri was "actively spreading Hamas propaganda and promoting antisemitism on social media" and that he "has close connections to a known or suspected terrorist, who is a senior advisor to Hamas."[4] McLaughlin also confirmed that Secretary of State Marco Rubio issued a determination on March 15 that Dr. Khan Suri's activities and presence in the U.S. rendered him deportable under INA Section 237(a)(4)(C)(i).

### III. THE ONGOING HARMS OF DR. KHAN SURI'S DETENTION

With his ongoing detention, Dr. Khan Suri's wife, Ms. Saleh, has been left as the sole caretaker for the couple's three young children. The family is dependent on Dr. Khan Suri's income as a professor and postdoctoral fellow. Ms. Saleh can no longer attend her classes at Georgetown to further her education, while simultaneously enduring the emotional toll of Dr. Khan Suri's continued detention and the prospect of raising her three children without his assistance and support. Dr. Khan Suri's three young children miss their father and regularly ask when he will come back home. Saleh Dec. ¶18-19.

Dr. Khan Suri, too, has endured ongoing distress and suffering. Rather than experiencing the holy month of Ramadan with his wife and children, in the company of their community and practice of prayer and rituals that usually mark the month for the family, Dr. Khan Suri languishes in federal detention in a crowded unit, sleeping on the floor, without access to religious accommodations. His scholarship and research as well as his first teaching opportunity at Georgetown University have been indefinitely suspended and his professional credibility, reputation, and future employment opportunities imperiled.

---

[4] Tricia McLaughlin, X, available at https://x.com/TriciaOhio/status/1902524674291966261.

Dr. Khan Suri was shackled and chained while being moved around the country to no fewer than five different detention facilities. And currently, he is subject to the harshest of conditions: held in an over-crowded segregation unit with high-security detainees, dressed in a red jumpsuit (usually reserved for people convicted of violent crimes), and forced to sleep on the floor in the common room where the TV remains on from 5 a.m. to 2 a.m. Since his arrest, he has been unable to practice his faith, having been denied Halal food, Ramadan fasting accommodations, a copy of the Quran, and a prayer mat despite repeated requests through all available means.

If released, Dr. Khan Suri will return to his home with his U.S. citizen wife and help her care for and raise their three children. He will continue his professional scholarship and teaching at Georgetown University and provide for his family. He will have the support of the many academics, colleagues, students, and friends who are calling for his release. He has never been accused of being a flight risk or a danger to the community, and any social-media-fueled suggestion otherwise is belied by the statements of support by those who actually know him in personal, academic, and professional settings.

**ARGUMENT**

I.    **THIS COURT HAS THE AUTHORITY TO GRANT DR. KHAN SURI'S IMMEDIATE RELEASE PENDING THE ADJUDICATION OF HIS HABEAS PETITION.**

This Court has the authority to grant Dr. Khan Suri's release pending adjudication of his habeas. Federal courts have recognized their "inherent authority" to set bail pending the adjudication of a habeas petition when the petition has raised (1) substantial claims and (2) extraordinary circumstances that (3) "make the grant of bail necessary to make the habeas remedy effective." *See Mapp v. Reno*, 241 F.3d at 230. *See also Lucas*, 790 F.2d at 367; *Baker v. Sard*, 420 F.2d at 1343; *Eliely*, 276 F. App'x at 270 (referencing the standard for release on bail of a prisoner pending a collateral attack on the conviction). Courts in the Fourth Circuit have recognized their

11

power to release individuals on bail pursuant to the *Mapp* line of reasoning in contexts involving challenges to removal and challenges to detention. *See, e.g., Coreas,* 2020 WL 5593338, at \*15 (holding that the court has the inherent authority to conduct bail reviews of individual ICE detainees who have filed habeas petitions); *Young,* 2021 WL 62573, at \*1 (granting release pending adjudication of habeas petition seeking release from detention).

## II.    DR. KHAN SURI MEETS THE STANDARD FOR RELEASE.

### A.  DR. KHAN SURI RAISES SUBSTANTIAL CLAIMS.

Dr. Khan Suri raises substantial claims. Through his habeas corpus petition, Dr. Khan Suri seeks to protect his rights under the First Amendment, the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act and the *Accardi* doctrine. Each of these claims is substantial.

The First Amendment claims are undoubtedly substantial. "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). In particular, "speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

Dr. Khan Suri's claims—that he is being punished as a result of his political speech and the views he expresses—therefore implicate the heart of the First Amendment. Few governmental actions could be more chilling on speech than a federal agency choosing to jail an individual based on their political speech critical of government policies. *See City of Houston v. Hill*, 482 U.S. 451,

46263 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). It is beyond contest that "[f]reedom of speech and press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (citing *Bridges v. California*, 314 U.S. 252 (1941)). Several courts have held that the First Amendment protects noncitizens who are detained and threatened with deportation as a result of their protected speech. *See, e.g., Bello-Reyes v. Gaynor*, 985 F.3d 696, 698 (9th Cir. 2021); *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *cert. granted, remanded, and vacated sub nom. on other grounds, Pham v. Ragbir*, 141 S. Ct. 227 (2020); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018). Likewise, the First Amendment restricts the ability of the government to impose liability on an individual solely because of their association with another person, including who they choose to marry. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 918-919 (1982). "[G]uilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." *Healy v. James*, 408 U.S. 169, 186 (1972) (internal quotations omitted).

Dr. Khan Suri's Due Process claims are similarly substantial. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The government's detention of Dr. Khan Suri is wholly unjustified. *See Black v. Decker*, 103 F.4th 133, 157 (2d Cir. 2024) (collecting cases and noting that where an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence). The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen and professor legally in the U.S. on an academic exchange visa, with no

criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further twin goals of (1) ensuring noncitizen's appearance during removal proceedings and (2) preventing danger to community). And there is no credible argument that Dr. Khan Suri cannot be safely released back to his family. Rather, Dr. Khan Suri's detention is purely punitive as it bears no "reasonable relation" to any legitimate government purpose. *Id.* (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The asserted bases of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. To the extent that Dr. Khan Suri is being held punitively simply because he is associated with his U.S. born wife of Gazan descent, due process is also implicated as there are no allegations of personal guilt, danger, or flight risk that could justify such a detention.

Finally, the APA and *Accardi* doctrine claims are substantial. The government has adopted a patently unconstitutional and unlawful policy of targeting noncitizens for removal based on First Amendment-protected speech advocating for Palestinian rights. In the past month, pursuant to this policy, the government has arrested Mahmoud Khalil, a recent Columbia University graduate, legal permanent resident, and pro-Palestine advocate,[5] Leqaa Kordia, a pro-Palestinian student protestor at Columbia University,[6] and Rumeysa Ozturk, a doctoral student at Tufts University who co-authored an op-ed criticizing the university's response to pro-Palestinian advocacy by a student government body.[7] And they have attempted to arrest Yunseo Chung, a Columbia University

---

[5] *See* Am. Pet. ¶¶ 9, 20-21, ECF No. 38, *Khalil v. Joyce*, No. 25- cv- 1935 (S.D.N.Y. Mar. 13, 2025).
[6] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), available at https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supportinghamas-and.
[7] Nate Raymond, *Trump Administration Detains Turkish Student at Tufts, Revokes Visa*, Reuters (Mar. 27, 2025), *available at* https://www.reuters.com/world/us/tufts-says-international-student-taken-into-us-custody-visa-revoked-2025-03-26/.

undergraduate, legal permanent resident, and pro-Palestinian protestor,[8] Momodou Taal a Cornell University doctoral student, F-1 student visa holder, and pro-Palestinian advocate,[9] and Ranjani Srinivasan a Columbia University doctoral student and F-1 student visa holder who was *perceived* to be a pro-Palestinian protestor.[10] Public statements by President Trump, Secretary Rubio, and DHS and White House officials confirm all these individuals were targeted and labeled "terrorist sympathizers,"[11] "siding with terrorists"[12] who "advocated for violence and terrorism"[13] because of their pro-Palestinian speech on social media[14] or for their participation in protests in support of Palestinian freedom. Government officials characterized these activities as "agitating and supporting Hamas" by "put[ting] [themselves] in the middle of the process of basically pro-Palestinian activity."[15] Most notably, the day after Mr. Khalil's arrest, President Trump issued a

---

[8] Santul Nerkar & Jonah E. Bromwich, *Judge Order U.S. to Stop Attempts to Deport Columbia Undergraduate,* N.Y. Times (Mar. 25, 2025), https://www.nytimes.com/2025/03/25/nyregion/columbia-university-protester-chung-deportation.html. ("No trips to Louisiana here,' Judge Buchwald said, and barred transferring Ms. Chung away from the Southern District of New York."); s*ee also* Order for TRO, ECF No. 20, *Chung v. Trump et al.*, No. 1:25-cv-02412 NRB (S.D.N.Y. Mar 25, 2025) (enjoining the government from detaining Petitioner).

[9] *See* Letter Br., ECF No. 25, *Taal et al. v. Trump et al*, No. 3 :25-00335 (N.D.N.Y. Mar. 19, 2025).

[10] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), available at https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristinoem-video.html. (Ms. Srinivasan, who was arrested by police during a pro-Palestinian protest at Columbia University in April 2024, states that she was returning home after a departmental picnic when she was caught between protestors and the police barricades. "Her case was quickly dismissed and did not result in a criminal record, according to her lawyers and court documents.").

[11] Kristi Noem, X (Mar. 14, 2025, 11:01 a.m.), available at https://x.com/Sec_Noem/status/1900562928849326488.

[12] White House Daily Briefing, C-SPAN (Mar. 11, 2025), available at https://www.c-span.org/program/white-houseevent/white-house-daily-briefing/657022 (timestamp 10:16).

[13] VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport, Dep't of Homeland Sec. (Mar. 14, 2025), available at https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supportinghamas-and.

[14] *See* Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), available at https://www.politico.com/news/2025/03/19/trump-deportationgeorgetown-graduate-student-00239754; *see also*  Dec. of Roy Stanley, Defendants' Opp'n to Motion for Preliminary Injunction and Temporary Restraining Order, ECF No. 30-2, *Taal et al. v. Trump et al.* , No. 3:25-00335 (N.D.N.Y. Mar. 19, 2025) (confirming DHS agents identified Mr. Taal as "a prominent pro-Palestinian activist involved in protests" by conducting a review of publicly available information in line with the directives of Executive Order 14188 on antisemitism and referred his case to the U.S. Dep't of State in reference to the Executive Order).

[15] Michel Martin & Destinee Adams, *DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened*, NPR (Mar. 13, 2025), available at https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalildeportation- arrests-trump.

statement emphasizing that Mr. Khalil's arrest was "the first of many to come," declaring that his Administration would not tolerate, "students at Columbia and other universities across the country who engage in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend and deport these terrorist sympathizers from our country."[16]

This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C). In addition, to the extent the Secretary of State has determined that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States," or "would compromise a compelling United States foreign policy interest," such determinations are arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C). Moreover, the government's actions present a classic violation of the *Accardi* doctrine, as the government is violating its regular processes and rules, including those pertaining to First Amendment activity, in order to detain and deport Dr. Khan Suri because he has been prejudged as undesirable. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (agency may not violate its own rules and processes simply because Attorney General singled him out for deportation); *see also, e.g.*, DHS, Memorandum of Kevin McAleenan (May 17, 2019) (stating DHS "does not profile, target, or discriminate against any individual for exercising his or her First Amendment Rights").[17]

Courts have routinely found challenges of this nature—particularly those involving constitutional concerns—to be "substantial claims" for purposes of *Mapp* release. *See Brooks v. Wilson*, E.D. Va. No. 3:16CV857, 2018 WL 11463555, at *2 (E.D. Va. June 15, 2018) (finding

---

[16] Donald J. Trump, Truth Social (Mar. 10, 2025, 1:05 p.m.), available at
https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.
[17] *Available at* https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_
activities_as1_signed_05.17.2019.pdf.

substantial claim of due process challenge to the basis of his incarceration); *Leslie v. Holder*, 865 F. Supp. 2d 627, 634 (M. D. Pa. Mar. 29, 2012) (finding Petitioner's due process challenge to his prolonged detention and deficiencies in his bond hearing to present substantial claims); *Cristian A.R. v. Decker,* 453 F. Supp. 3d 670, 689-90 (D.N.J. 2020) (finding substantial claims involving substantive due process challenge to detention); *Attorney Gen. Sanchez v. Winfrey*, No. CIV.A.SA04CA0293RFNN, 2004 WL 1118718, at *2-3 (W.D. Tex. Apr. 28, 2004) (finding petitioner's claim to be a substantial claim); *Coronel v. Decker*, 449 F. Supp. 3d 274, 289 (S.D.N.Y. 2020) (finding substantial claims of substantive and procedural due process challenges to detention); *Rado v. Manson*, 435 F. Supp. 349, 351 (D. Conn. 1977) (findings petitioner's challenge to prior trial to be a substantial claim); *see also United States v. Nkanga*, 452 F. Supp. 3d 91, 85 (S.D.N.Y. 2020) (finding petitioner's ineffective assistance of counsel claim to be a substantial claim); *S.N.C., v. Sessions*, No. 18 CIV. 7680 (LGS), 2018 WL 6175902, at *6 (S.D.N.Y. Mar. 2, 2018) (finding substantial claims that petitioner's "due process rights are infringed if she is removed before her visa applications are adjudicated"). Dr. Khan Suri's claims more than meet this prong of the *Mapp* standard.

### B. DR. KHAN SURI'S CASE PRESENTS EXTRAORDINARY CIRCUMSTANCES.

The circumstances of Dr. Khan Suri's detention and placement in removal proceedings have been extraordinary from the outset. Dr. Khan Suri was taken late at night from his home on March 17 in front of his wife by masked agents in unmarked cars. Thereafter, he was moved to the Washington ICE Field Office in Chantilly and then to Farmville Detention Center—all within 6-7 hours. Shortly thereafter, and while Dr. Khan Suri's counsel was attempting to locate him and file his petition for habeas relief, the government commenced his transfer to another state over 1000 miles away. Throughout this period, neither his counsel nor his wife's attempts to locate his

17

whereabouts and establish contact proved fruitful until March 20, when he was able to call his wife, indicating he was at the Alexandria Staging Facility in Alexandria, Louisiana. The Alexandria Staging Facility is a privately operated removal facility on the site of the Alexandria airport, typically functioning as a 72-hour holding site prior to an individual's removal from the country. From there, he was moved again on March 21 to the Prairieland Detention Facility in Alvarado, Texas. The Prairieland Detention Facility was Dr. Khan Suri's fifth ICE site placement in five days.

Today, Dr. Khan Suri's detention poses numerous insurmountable harms. Chiefly, Dr. Khan Suri and his wife, a citizen of the United States, face the daunting, painful prospect of her raising and providing for their three children without Dr. Khan Suri's assistance and presence. Ms. Saleh is also faced with the overwhelming stress of her husband's initial disappearance, his covert, overnight transfer across multiple state lines to a detention facility more than 1300 miles away, and the ensuing strain of his indefinite absence. What's more, Dr. Khan Suri suffers in detention in Texas, far from his community, counsel, wife, and three small children. Moreover, there are no allegations that Dr. Khan Suri is a flight risk or a danger to the community. Dr. Khan Suri has never been arrested or convicted of a crime. He is the loving husband of a U.S. citizen, a father of three young children, and a scholar and teacher at Georgetown University. Numerous people attest to his character, community ties, and lack of flight risk or dangerousness. *See* Ex. 2, Letters of Support.

Despite this, federal officials have orchestrated his abrupt and highly-publicized arrest and detention as punishment for his speech and family ties, unjustified by any indicia of flight risk or danger. Now, Dr. Khan Suri sits in a remote, crowded prison, sleeping on a floor, unable to access basic services and unable to communicate effectively with counsel, unable to see his wife or children, and unable to speak freely to the outside world.

Numerous courts have found extraordinary circumstances in light of similar factors, including factors related to individualized circumstances and family. *See Brooks*, 2018 WL 11463555, at \*2 (finding extraordinary circumstances based on his underlying challenge to incarceration, the time it would take to consider his habeas claim, and the need to preserve effectiveness of habeas remedy); *Leslie*, 865 F.Supp.2d at 638 (describing extraordinary circumstances, including petitioner's substantial family ties in the U.S., health concerns, and completion of GED and programming); *Han Tak Lee v. Cameron*, No. 4:08-CV-1972, 2014 WL 4187590, at \*3 (M.D. Pa. Aug. 22, 2014) (describing extraordinary circumstances in a criminal case to include lack of prior criminal history, minimal disciplinary history while incarcerated, and support from the community); *Nkanga*, 452 F. Supp. 3d at 96 (describing extraordinary circumstances in a criminal case to "include the defendant's age; his multiple health issues; the nature of the defendant's offense; the precise timing of the sentencing proceeding ... in relation to the emerging COVID-19 pandemic; and the conclusions already reached by the Court in previous aspects of this litigation regarding the defendant's health issues, and apparent lack of dangerousness or risk of flight"); *S.N.C.*, 2018 WL 6175902, at \*6 (finding extraordinary circumstances in light of petitioner's health care needs, impact of detention, and need to care for her children); *Kiadii v. Sessions,* 423 F. Supp. 3d 18, 18 (S.D.N.Y. 2018) (finding extraordinary circumstances based on claims that detention was unjustified and based on impact of detention on health); *D'Alessandro v. Mukasey*, No. 8 Civ 914, 2009 WL 799957, at \*3 (W.D.N.Y. Mar. 25, 2009) (finding extraordinary circumstances with respect to petitioner's family ties, prospects for employment, and health issues). The silencing and chilling effect on speech, the impact on Dr. Khan Suri's ability to support his wife and their three children, the impact of detention on his own

19

health and wellbeing, and the lack of any factors justifying physical confinement, all demonstrate extraordinary circumstances.

### C.  THESE EXTRAORDINARY CIRCUMSTANCES MAKE THE GRANT OF BAIL NECESSARY TO MAKE THE HABEAS REMEDY EFFECTIVE

The extraordinary circumstances described render the habeas remedy ineffective if Dr. Khan Suri is forced to remain in detention pending the litigation of his claims. First, with respect to Dr. Khan Suri's First Amendment claims, a core part of the remedy sought is designed to prevent the federal government from retaliating against Dr. Khan Suri for his protected political speech and association with his U.S. citizen wife of Gazan descent. His detention unquestionably chills his speech, as the federal government monitors and controls his ability to communicate with the outside world and has complete power over all of the decisions that impact his daily life inside a remote prison. In addition, his detention is a government intrusion into his marital relationship with his wife, solely because of her national origin, and intentionally orchestrated to remove him far from this protected association with his spouse. If Dr. Khan Suri ultimately wins his First Amendment claim, the effectiveness of an order of release to vindicate his rights will be vastly diminished if the federal government was able to detain him for the pendency of the litigation. *Cf. Brooks,* 2018 WL 11463555, at *2 (agreeing that bail pending resolution of defendant's claim "necessary to preserve the effectiveness of the habeas remedy should he ultimately prevail on his habeas claim."). His challenge to the constitutionality of the government's decision to detain him in the first place is a significant part of the First Amendment injury at the center of this litigation.

Second, the habeas remedy is designed to ensure that Dr. Khan Suri maintains meaningful access to the judicial process. He cannot meaningfully assist in the litigation of this case when he is far away from his legal team and the government restricts his ability to regularly speak to counsel

20

and places his health at risk. Release would allow Dr. Khan Suri to have regular access to counsel and address the rapidly unfolding issues in his case.

Third, the habeas remedy is necessary to avoid what, on a personal level, is the most punitive consequence of his detention—being unable to support his U.S. citizen wife and three small children. Dr. Khan Suri spends most of his time in detention deeply stressed about the safety and wellbeing of his wife and children, which is detrimental to his own health. Other courts have ordered release under *Mapp* to petitioners like Dr. Khan Suri, where justice delayed means justice denied. *See, e.g., Brooks*, 2018 WL 11463555, at *2; *Leslie*, 865 F. Supp. 2d at 638-40; *Cristian A.R.*, 453 F. Supp. 3d at 689-90; *Asmed B*. v. *Decker*, 460 F. Supp. 3d 519,534 (D.N.J. 20202); *Nkanga*, 452 F. Supp. 3d at 96; *S.N.C.*, 2018 WL 6175902, at *6; *Kiadii*, 423 F. Supp. 3d at 18; *Avendano Hernandez v. Decker*, 450 F. Supp. 3d 443, 447-449 (S.D.N.Y. 2020); *D'Alessandro*, 2009 WL 799957, at *3; *Coronol*, 449 F. Supp. 3d at 289; *Barbecho v. Decker*, No. 20-CV-2821 (AJN), 2020 WL 2513468, at *7 (S.D.N.Y. May 15, 2020). Dr. Khan Suri's separation from his loved ones and community also detracts from his ability to enjoy the spiritual comfort that he normally experiences during the holy month of Ramadan.  If Dr. Khan Suri is forced to remain isolated in a remote prison, he will be suffering exactly the retaliatory and punitive harms he seeks to prevent through this litigation.

## CONCLUSION

For the foregoing reasons, this motion should be granted, and this Court should order Respondents to release Dr. Khan Suri pending the adjudication of this case. Doing so restores Dr. Khan Suri as close as possible to the status quo prior to this controversy and puts an end to the extraordinary harms he is experiencing in detention so that the habeas remedies he seeks in this

case will be effective. This serves the interest of justice by allowing the parties and this Court a full and fair opportunity to consider the serious matters presented in this case.


Dated: March 27, 2025                    Respectfully submitted,

                                         /s/*Eden B. Heilman*
                                         Eden B. Heilman, VSB No. 93554
                                         Sophia Leticia Gregg, VSB No. 91582
                                         Vishal Agraharkar, VSB No. 93265
                                         Geri Greenspan, VSB 76786
                                         AMERICAN CIVIL LIBERTIES
                                         UNION FOUNDATION OF VIRGINIA
                                         P.O. Box 26464
                                         Richmond, VA 23261
                                         Tel: (804) 523-2152
                                         eheilman@acluva.org
                                         sgregg@acluva.org
                                         vagraharkar@acluva.org
                                         ggreenspan@acluva.org


                                         Hassan Ahmad (VSB #83428)
                                         The HMA Law Firm, PLLC
                                         6 Pidgeon Hill Dr, Suite 330
                                         Sterling, VA 20165
                                         T: 703.964.0245
                                         hma@hmalegal.com


                                         Nermeen Saba Arastu (admitted *pro hac vice*)
                                         The Immigrant & Non-Citizen Rights Clinic
                                         Main Street Legal Services, Inc.
                                         CUNY School of Law
                                         2 Court Square, 5th Floor
                                         Long Island City, NY 11101
                                         Tel: (202) 246-0124
                                         Nermeen.arastu@law.cuny.edu


                                         *Counsel for Petitioner*


22

**CERTIFICATE OF SERVICE**

I, Eden B. Heilman, hereby certify that on this date, I uploaded a copy of Petitioner's

Motion for Release on Bond and any attachments using the CM/ECF system, which will cause

notice to be served electronically to all parties.

Date: March 27, 2025                    Respectfully submitted,


                                        /s/*Eden B. Heilman*
                                        Eden B. Heilman, VSB No. 93554
                                        AMERICAN CIVIL LIBERTIES
                                        UNION FOUNDATION OF VIRGINIA
                                        P.O. Box 26464
                                        Richmond, VA 23261
                                        Tel: (804) 523-2152
                                        eheilman@acluva.org