### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| BADAR KHAN SURI, | ) |
| | ) |
| *Petitioner,* | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD TRUMP, *in his official capacity* | ) |
| *as President of the United States;* RUSSELL | )    Case No. 1:25-cv-480 (PTG/WBP) |
| HOTT, *in his official capacity as Field* | ) |
| *Office Director of Washington, Immigration* | ) |
| *and Customs Enforcement;* JEFFREY | ) |
| CRAWFORD, *in his official capacity as* | ) |
| *Warden of Farmville Detention Center;* | ) |
| TODD LYONS, *Acting Director, U.S.* | ) |
| *Immigration and Customs Enforcement*; | ) |
| KRISTI NOEM, *in her official capacity as* | ) |
| *Secretary of the United States Department of* | ) |
| *Homeland Security;* MARCO RUBIO, *in his* | ) |
| *official capacity as Secretary of State*; | ) |
| PAMELA BONDI, *in her official capacity* | ) |
| *as Attorney General, U.S. Department of* | ) |
| *Justice,* | ) |
| | ) |
| *Respondents.* | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Petitioner Dr. Badar Khan Suri's Motion to Compel

Respondents to Return Petitioner to this District (Dkt. 5), Petitioner's Motion for Release on Bond

(Dkt. 20), and Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue

(Dkts. 24, 25). On March 18, 2025, the Petition for Writ of Habeas Corpus and Complaint was

filed. Dkt. 1. On April 8, 2025, Petitioner filed an Amended Petition for Writ of Habeas Corpus

and Complaint ("Amended Petition"). Dkt. 34. On May 1, 2025, the Court heard oral argument

primarily focused on the issue of jurisdiction, which must be resolved before reaching the other

motions.[1] At the conclusion of the hearing, the Court directed the parties to submit supplemental filings. Dkt. 55.

Petitioner, an Indian national, is a postdoctoral fellow at Georgetown University and resides in Rosslyn, Virginia, within the Eastern District of Virginia. On March 17, 2025, Department of Homeland Security ("DHS") agents arrested Petitioner outside of his apartment building. Within hours of his arrest, Petitioner was moved four times within the District. On March 18, 2025—less than twenty-four hours after his arrest—Petitioner filed his habeas petition against Donald J. Trump, President of the United States; Russell Hott, Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE"); Jeffrey Crawford, Warden of the Farmville Detention Center; Todd Lyons, Acting Director of ICE; Kristi Noem, Secretary of DHS; Marco Rubio, United States Secretary of State; and Pamela Bondi, Attorney General of the United States (collectively, "Respondents" or "Government"). The Petition alleges that Dr. Khan Suri was arrested and detained in violation of his First Amendment and Fifth Amendment rights and the Administrative Procedure Act ("APA"). At the time of filing, Petitioner was in Alexandria, Louisiana, purportedly en route to Texas. Petitioner is currently detained in the Prairieland Detention Center in Alvarado, Texas.

The parties dispute whether this Court has proper habeas jurisdiction to review Petitioner's claims. For the reasons that follow, the Court finds that it has proper habeas jurisdiction to consider the Petition. Accordingly, Respondents' Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

---

[1] Typically, the filing of an amended complaint moots a pending motion to dismiss. Because the Amended Petition would not change the jurisdictional arguments advanced in the pending motion to dismiss, the Court construes the motion as applying to the Amended Petition.

**Factual Background**

The parties dispute some aspects of the factual record. The following facts are taken from declarations filed on the docket and attached to the parties' pleadings as well as admissions made during oral argument.[2]

Petitioner Badar Khan Suri is an Indian national, who was raised in Uttar Pradesh, India. Dkt. 1 ("Pet.") ¶ 10; Dkt. 6, Ex. 1, Declaration of Mapheze Saleh ("Saleh Decl.") ¶ 6. Dr. Khan Suri earned his Ph.D. in Peace and Conflict Studies from the Nelson Mandela Center for Peace and Conflict Resolution at Jamia Millia Islamia. Saleh Decl. ¶ 8. In December 2022, Dr. Khan Suri came to the United States after receiving a J-1 exchange visa to participate in a fellowship at Georgetown University. Pet. ¶¶ 2, 10; Saleh Decl. ¶ 10. As part of the fellowship, Dr. Khan Suri teaches a class on "Majoritarianism & Minority Rights in South Asia" at Georgetown. Pet. ¶ 10; Saleh Decl. ¶ 10. Dr. Khan Suri is married to Mapheze Saleh, a United States citizen, whom he met in Gaza as part of a humanitarian convoy. Saleh Decl. ¶¶ 2, 6. Ms. Saleh lived in the United States until she was five years old, at which point, her family moved to Gaza. *Id.* ¶ 3. Ms. Saleh's father is a former deputy of foreign affairs in Gaza. *Id.* ¶ 4. In November 2023, Ms. Saleh returned to the United States with her three young children whom she shares with Dr. Khan Suri. *Id.* ¶ 10.

In October 2023, Ms. Saleh began sharing posts online detailing events in Gaza and "express[ing] sorrow for the deaths of Gazan people." *Id.* ¶ 11. By February 2025, Ms. Saleh learned that she was being targeted by certain websites because of her posts and her father's former

---

[2] Absent an evidentiary hearing, the Court accepts the non-movants factual assertions. *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) ("When determining whether a plaintiff has made the requisite *prima facie* showing [of personal jurisdiction], the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff.").

position in the government of Gaza. *Id.* ¶ 12. Ms. Saleh and Dr. Khan Suri's family were the subject of multiple articles, and the pair were accused of having "ties to Hamas." *Id.*

"On March 15, 2025, Secretary of State Marco Rubio issued a memorandum finding that [Dr. Khan] Suri's presence and activities in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." Dkt. 26, Ex. 1, Declaration of Joseph Simon ("First Simon Decl.") ¶ 6. On that same day, a "custody determination [was issued] indicating that [Dr. Khan Suri] would be detained pursuant to" 8 U.S.C. § 1226(a). *Id.*

On March 17, 2025, between 9:20 and 9:30 p.m., Dr. Khan Suri was returning to his home in Rosslyn, Virginia after breaking his fast at iftar.[3] Dkt. 47, Ex. 1, Declaration of Badar Khan Suri ("Khan Suri Decl.") ¶ 2; Saleh Decl. ¶ 13. Several unmarked cars drove up to Dr. Khan Suri's apartment building. Khan Suri Decl. ¶ 3. A man emerged from one of the vehicles dressed in grey clothes and wearing a mask. *Id.* He proceeded to prevent Dr. Khan Suri from entering his building. *Id.* The officers told Ms. Saleh that they were from Homeland Security and proceeded to arrest Dr. Khan Suri. Saleh Decl. ¶ 13; Khan Suri Decl. ¶¶ 4-6; First Simon Decl. ¶ 7.

At the time of Dr. Khan Suri's arrest, the officers confiscated Dr. Khan Suri's passport and immigration documents. Saleh Decl. ¶ 13. The arresting officers told Ms. Saleh and Dr. Khan Suri that he would be taken to Chantilly, Virginia. *Id.*; Khan Suri Decl. ¶ 6. The arresting officers also told Dr. Khan Suri that his "student visa" had been revoked, that he was being arrested because of social media, and that he would be deported to his country that day.[4] Khan Suri Decl. ¶¶ 7-8.

---

[3] Unless otherwise specified, all references to time are in E.D.T. ("Eastern Daylight Time").

[4] As stated above, the Court notes that Dr. Khan Suri had a J-1 exchange visa, not a student visa. Khan Suri Decl. ¶ 4; Saleh Decl. ¶ 10.

Specifically, Dr. Khan Suri was taken to ICE's Enforcement and Removal Operations ("ERO") Washington Field Office in Chantilly, Virginia. *Id.* ¶ 9; First Simon Decl. ¶ 7.

While at the Chantilly Office, officers told Dr. Khan Suri that he was being transferred to the Farmville Detention Center in Virginia, where he believed he would be held for a longer term and was permitted to tell his wife this information. Khan Suri Decl. ¶¶ 12-14. Dr. Khan Suri called his wife to tell her that he was being transferred to Farmville. *Id.* ¶ 13. Officers showed Dr. Khan Suri the Notice to Appear ("NTA"), which listed a Texas address as his current residence and specified that he had a May 6, 2025 hearing date in immigration court in Texas. *Id.* ¶ 9; Dkt. 26, Ex. 1 at 6 ("NTA"). When Dr. Khan Suri asked about the Texas address and why his hearing was in May, an officer responded that "it was just computer generated, and it might be changed later on." Khan Suri Decl. ¶ 9.

ICE represents that it determined that Dr. Khan Suri would not be detained in Farmville or Caroline Detention Centers in Virginia because they were concerned about "potential overcrowding." First Simon Decl. ¶ 8. ICE also represents that from March 1, 2025 to March 13, 2025, it had "conducted a surge of targeted enforcement actions within the Northern Virginia and Washington D.C. region which resulted in an additional 214 arrests." *Id.* Because ICE detention centers in Virginia were operating at a "high capacity" at the time of Dr. Khan Suri's arrest, and because "detention facilities in Texas and Louisiana had sufficient capacity to house [Dr. Khan] Suri[,]" "ERO Washington determined that [he] would be detained at Prairieland Detention Facility." *Id.* ¶¶ 8-9. ICE also represents it made the decision to detain Dr. Khan Suri at the Prairieland Detention Center at approximately 10:00 p.m. on March 17, 2025. Dkt. 57-1, Declaration of Mark Graham ("Graham Decl.") ¶ 9.

At approximately 10:42 p.m., on March 17, 2025, Dr. Khan Suri's counsel, Hassan Ahmad, learned of Dr. Khan Suri's arrest. Dkt. 21, Ex. 1, Declaration of Hassan Ahmad ("Ahmad Decl.")

¶¶ 1, 3. Meanwhile, Dr. Khan Suri was being processed at the ERO Office in Chantilly. First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Overnight Dr. Khan Suri was driven to the Farmville Detention Center arriving around 2:35 a.m. on March 18, 2025. First Simon Decl. ¶ 11; Khan Suri Decl. ¶¶ 12-14. Later that morning, ICE transferred Dr. Khan Suri to another ERO Washington office in Richmond, Virginia, where he arrived at approximately 7:50 a.m. First Simon Decl. ¶ 11; Khan Suri Decl. ¶ 15. Around 8:34 a.m., other attorneys in North Carolina provided more information to Mr. Ahmad about Dr. Khan Suri and his family. Ahmad Decl. ¶ 5. Shortly thereafter, Mr. Ahmad agreed to help Dr. Khan Suri. *Id.* ¶ 6. Between 9:00 a.m. and 11:00 a.m., Mr. Ahmad and Mr. Ashraf Nubani, a friend of Dr. Khan Suri's family, discussed Dr. Khan Suri and his arrest. *Id.* At 1:52 p.m., Mr. Ahmad spoke to Ms. Saleh, who believed that Dr. Khan Suri would be in the Farmville Detention Center since that was the last thing Dr. Khan Suri shared with her about his location. Ahmad Decl. ¶¶ 6, 8; Saleh Decl. ¶ 14. At 2:11 p.m., Mr. Ahmad formally entered his appearance in Dr. Khan Suri's immigration case. Ahmad Decl. ¶ 7.

After entering his appearance, Mr. Ahmad was able to view Dr. Khan Suri's NTA at 2:11 p.m. *Id.* The NTA indicates that Dr. Khan Suri *currently resides* at "1209 Sunflower Ln, Alvarado, Texas, 760092810." NTA at 1. While not explicitly stated on the NTA, this is the address of the Prairieland Detention Center, which is located in the Northern District of Texas. First Simon Decl. ¶ 9. Based on the electronic signature block of the issuing officer, it appears that the NTA was issued around 9:47 p.m. on March 17, 2025—while Dr. Khan Suri was still in Chantilly, Virginia. NTA at 1; First Simon Decl. ¶ 7; Khan Suri Decl. ¶ 9. Up to that time, Dr. Khan Suri had never been to 1209 Sunflower Lane, Alvarado, Texas. The NTA also ordered Dr. Khan Suri to appear before an immigration judge on May 6, 2025, at a different Texas address: "27991 Buena Vista Blvd, Los Fresnos, Texas, 78566." NTA. This is the address of the Port

6

Isabel Detention Center, which is located in the Southern District of Texas and approximately 500 miles away from the Prairieland Detention Center. First Simon Decl. ¶ 14.

Unbeknownst to anyone, on the afternoon of March 18, 2025, Dr. Khan Suri was taken to an airport in Richmond, Virginia and placed on a flight that departed at 2:47 p.m. *Id.* ¶ 11; Khan Suri Decl. ¶¶ 16-17; Ahmad Decl. ¶ 8. Still, Dr. Khan Suri did not know where he was headed, nor was he permitted to further communicate his whereabouts to his wife or to his counsel, if he had known he had counsel. Khan Suri Decl. ¶¶ 16-17. He boarded a flight with over 300 other people. *Id.* ¶ 17; First Simon Decl. ¶ 11. At this time, Mr. Ahmad was working diligently to file Dr. Khan Suri's habeas petition. Ahmad Decl. ¶¶ 7-8. Around 5:03 p.m. on March 18, 2025, Dr. Khan Suri arrived in Alexandria, Louisiana. Khan Suri Decl. ¶ 18; First Simon Decl. ¶ 11. At 5:59 p.m. on March 18, 2025, Dr. Khan Suri filed his original habeas petition in this Court. Pet.; Ahmad Decl. ¶ 8. Dr. Khan Suri was booked into the Alexandria Staging Facility ("ASF") at 6:42 p.m. (5:42 p.m. Central Daylight Time). Dkt. 49, Ex. 1, Second Declaration of Joseph Simon ("Second Simon Decl.") ¶ 3; Graham Decl. ¶ 15.

Dr. Khan Suri was then detained in the ASF in Alexandria, Louisiana for three nights. Khan Suri Decl. ¶¶ 18-22; First Simon Decl. ¶ 12. On March 19, Dr. Khan Suri attempted to make a free call to his wife, but he was not able to directly communicate with her.[5] Khan Suri Decl. ¶¶ 19-20; Saleh Decl. ¶ 15. On March 20, 2025, Dr. Khan Suri was told he would be transferred to New York the following day, presumably to be deported. Khan Suri Decl. ¶ 21. On the same day, this Court also entered its Order directing that Petitioner not be removed from the United States. Dkt. 7. On the morning of March 21, 2025, Dr. Khan Suri was told that he was no longer going

---

[5] Ms. Saleh's declaration seems to say that she received a call with a recording from Dr. Khan Suri on March 18, but this appears to the Court to be an error. Saleh Decl. ¶ 15.

to New York and would instead be driven to Texas. Khan Suri Decl. ¶ 22. ICE drove Dr. Khan Suri by bus from the ASF to the Prairieland Detention Center in Texas arriving at 7:30 p.m. on March 21, 2025, where he remains detained. Second Simon Decl. ¶ 3; Graham Decl. ¶ 16; Khan Suri Decl. ¶ 22.

Upon his arrival in Prairieland, Dr. Khan Suri was forced to sleep on the floor because there were not enough beds available. Khan Suri Decl. ¶ 22. As of April 9, 2025, Dr. Khan Suri had a bed and a pillow, but his requests for religious accommodation had largely been denied. *Id.* ¶¶ 23-24.

### Procedural History

On March 18, 2025, at approximately 5:59 p.m., Petitioner filed his habeas petition pursuant to 28 U.S.C. § 2241. Dkt. 1. On March 20, 2025, Petitioner filed a Motion to Compel Respondents to Return Petitioner to this District. Dkt. 5. On March 27, 2025, Petitioner filed a Motion for Release on Bond. Dkt. 20. The Court initially set the motions for hearing on April 11, 2025. Dkt. 23. On April 1, 2025, Respondents filed a Motion to Dismiss, or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25), which were noticed for May 1, 2025. Dkt. 27. On April 4, 2025, this Court entered an Order directing Petitioner to address Respondents' jurisdictional arguments in his reply to Respondents' oppositions. Dkt. 31. At Petitioner's request, the Court reset the hearing on all motions for May 1, 2025. Dkt. 33. On April 8, 2025, Petitioner filed the Amended Petition. Dkt. 34.

### Discussion

Section 2241 "broadly grants federal courts the power to award habeas corpus relief to petitioners who are in custody in violation of federal law." *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 669 (E.D. Va. 2020). "[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004)

(citing U.S. Const., Art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it")). The Great Writ is "a vital instrument for the protection of individual liberty" and "freedom from unlawful restraint." *Boumediene v. Bush*, 553 U.S. 723, 739, 743 (2008). Specifically, the writ is "a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Hamdi*, 542 U.S. at 525. In the United States, "there is no gap in the fabric of habeas --- no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." *Khalil v. Joyce et al.*, 2025 WL 972959, at *37 (D.N.J. Apr. 1, 2025) ("*Khalil II*"), *mot. to certify appeal granted*, 2025 WL 1019658 (D.N.J. Apr. 4, 2025).

This Court must decide which court has jurisdiction to hear and decide Dr. Khan Suri's habeas petition. Respondents argue that this Court is not the proper venue for Dr. Khan Suri's habeas petition and does not have jurisdiction to hear his claims because Dr. Khan Suri was not in the Eastern District of Virginia at the time his petition was filed. Dkt. 26 at 4. Instead, Respondents argue that Petitioner's claims can only be heard in the Northern District of Texas—despite the fact that Dr. Khan Suri was not in Texas at the time the petition was filed. *Id.*; Dkt. 49 at 19-20. To come to this conclusion, Respondents purport to rely on the default rules of habeas jurisdiction. Dkt. 26 at 5. In response, Petitioner contends that this case involves extraordinary circumstances that require departure from the default rules of habeas jurisdiction. Dkt. 47 at 11. Based on noted exceptions to the rules of habeas jurisdiction, Petitioner argues that this Court maintains jurisdiction over his claims despite his removal from this District. *Id.* at 9. The Court agrees with Petitioner.

## I.    Habeas Corpus Jurisdiction

Section 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective

jurisdictions." In *Rumsfeld v. Padilla*, the Supreme Court described the contours of habeas jurisdiction. 542 U.S. 426 (2004). Generally, a habeas petition seeking to challenge present physical custody should be filed "in the district of confinement" and "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner].'" *Padilla*, 542 U.S. at 434, 447 (alteration in original) (quoting 28 U.S.C. § 2242); *see also Kanai v. McHugh*, 638 F.3d 251, 255 (4th Cir. 2011) ("When a petitioner is physically detained . . . the 'district of confinement' necessarily is the location of both the habeas petitioner and the immediate custodian."). These default rules are known as the district of confinement and immediate custodian rules. When applying these rules, courts look to the place where the petitioner was confined when the petition was filed. *See United States v. Little*, 392 F.3d 671, 680 (4th Cir. 2004) (noting that because petitioner was confined in Texas when his petition was filed, the Western District of North Carolina was an improper venue).[6]

When the default rules of habeas jurisdiction have proved untenable, the Supreme Court and Fourth Circuit have recognized exceptions to these default rules. *See Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 499 (1973) (allowing petitioner confined in Alabama to file habeas petition challenging Kentucky indictment in Kentucky); *Strait v. Laird*, 406 U.S. 341, 344-346 (1972) (allowing conscientious objector petitioner to name his ultimate custodian in habeas

---

[6] The *Padilla* Court expressly declined to decide whether the default rules of habeas jurisdiction apply to immigration detention. 542 U.S. 426, 435 n.8 (2004). The Fourth Circuit, however, has applied *Padilla*'s rules to instances of confinement unrelated to incarceration. *See e.g.*, *Kanai v. McHugh*, 638 F.3d 251, 255 (4th Cir. 2011) (applying *Padilla* to a conscientious objector's habeas petition). Further, district courts within the Fourth Circuit have applied *Padilla*'s rules to the immigration context. *See e.g.*, *Ming Hui Lu v. Lynch*, No. 1:15-cv-1100, 2015 WL 8482748, at *3 (E.D. Va. Dec. 7, 2015) (applying *Padilla* to individual detained during immigration proceedings); *Deng v. Crawford*, No. 2:20-cv-199, 2020 WL 6387010, at *3 (E.D. Va. Sept. 30, 2020), *report and recommendation adopted*, No. 2:20-cv-199, 2020 WL 6387326 (E.D. Va. Oct. 30, 2020) (same). Accordingly, this Court is persuaded that the default rules of habeas jurisdiction can apply to the immigration context.

petition); *Ex parte Endo*, 323 U.S. 283, 304-307 (1944) (finding a district court retains jurisdiction over properly filed habeas petition if petitioner is removed from district after filing); *U.S. v. Moussaoui*, 382 F.3d 453, 465 (4th Cir. 2004) (adopting exception to immediate custodian rule allowing petitioner to name ultimate custodian).  The Court must consider whether, in line with the Fourth Circuit and Supreme Court's precedent, the context of Dr. Khan Suri's petition warrants exception from the default rules.

In addition to known exceptions to the default jurisdictional rules, Justice Kennedy, in his *Padilla* concurrence, proposed an additional exception.  Justice Kennedy noted that

> if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention . . . habeas jurisdiction would be in the district court from whose territory the petitioner had been removed."

*Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court acknowledges Justice Kennedy's concurrence is not the holding of the *Padilla* Court.  However, "because Justice Kennedy and Justice O'Connor's votes were 'necessary to the formation of a majority,' Justice Kennedy's opinion is at least 'given particular weight.'" *Ozturk v. Trump et al.*, 2025 WL 1009445, at *6 (D. Mass. Apr. 4, 2025) ("*Ozturk I*") (quoting *Schmitz v. Zilveti*, 20 F.3d 1043, 1045 (9th Cir. 1994)).  In *Vasquez v. Reno*, the First Circuit forecasted the logic of Justice Kennedy's concurrence, explaining that under "extraordinary circumstances," the "normal" rules of habeas jurisdiction may not apply.  233 F.3d 688, 696 (1st Cir. 2000).  The First Circuit noted that such extraordinary circumstances may exist if the government "spirited an alien from one site to another in an attempt to manipulate jurisdiction." *Id.*

It is a foundational principle that in all cases "courts take care not to exceed their 'respective jurisdictions' established by Congress." *Padilla*, 542 U.S. at 451.  Nevertheless, "the very nature of the writ [of habeas corpus] demands that it be administered with the initiative and flexibility

11

essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Cherrix v. True,* 177 F. Supp. 2d 485, 495 (E.D. Va. 2001) (alteration in original) (quoting *Harris v. Nelson,* 394 U.S. 286, 291 (1969)).

## II.     Jurisdiction is Improper in the Northern District of Texas

Respondents contend that under *Padilla*'s default district of confinement and immediate custodian rules, jurisdiction is only proper in the Northern District of Texas. Dkt. 49 at 17-18. However, a straightforward application of the default rules shows that jurisdiction is not proper in the Northern District of Texas.

The default district of confinement rule instructs the Court to look to the place the individual was confined at the time the petition was filed. *Padilla,* 542 U.S. at 447; *Little,* 392 F.3d at 680. Here, the petition was filed at 5:59 p.m. on the evening of March 18, 2025. Petitioner did not arrive in the Northern District of Texas until March 21, 2025. Despite this, Respondents contend that because Petitioner was served with an NTA that listed his "current" residence address as the Prairieland Detention Facility, the Northern District of Texas is the only appropriate district in which Petitioner's claims can be heard. Dkt. 49 at 18-19. This argument is not persuasive. Any address listed on the NTA is irrelevant because at the time the petition was filed, Petitioner was not in the Northern District of Texas and did not arrive there until three days later.

To avoid this inconvenient outcome, Respondents argue that Petitioner was "in transit" when he was confined in Virginia and Louisiana, vesting jurisdiction in the Northern District of Texas because that is the only district in which Petitioner was "non-transitorily confined." Dkt. 26 at 12. In support, Respondents rely on *United States v. Poole.* 531 F.3d 263 (4th Cir. 2008). That reliance, however, is misplaced. In that case, the Fourth Circuit did not address where jurisdiction lies when a petitioner files their habeas petition while they are being repeatedly moved from one location to the next. Those facts were very different.

12

Poole was convicted in Maryland federal court and incarcerated, "at *his* request," in Kentucky. 531 F.3d at 265-66 (emphasis added). Poole was detained in Kentucky for approximately *nine years*. *Id.* at 265-67 (noting that he was sentenced in 1997 and filed his first § 2241 motion in 2006). While incarcerated in Kentucky, Poole filed multiple habeas petitions in Maryland and Kentucky federal courts and then filed a motion to amend the judgment against him in the Maryland court. *Id.* at 266-67. In order to permit Poole to attend this hearing, the Maryland court issued a writ of habeas corpus *ad testificandum*, which ordered the warden of the Kentucky facility to bring Poole to Maryland. *Id.* at 267-68. Then, during this hearing, Poole's counsel asked the Maryland court to allow Poole to be detained in Maryland "solely to enable the Maryland federal district court to assert jurisdiction" over a future habeas petition. *Id.* at 268. The Fourth Circuit found this contravened the Supreme Court's explanation "that the immediate custodian rule 'serves the important purpose of preventing forum shopping by habeas petitioners.'" *Id.* at 273 (quoting *Padilla*, 42 U.S. at 447). Accordingly, the Fourth Circuit held that "neither the issuance of the writ of habeas corpus *ad testificandum* nor the retention of [the petitioner in Maryland] conferred jurisdiction on the Maryland federal district court." *Id.* at 274. Instead, Poole should have filed his habeas petition in Kentucky, which was Poole's "original place of incarceration" where he was "permanently confined." *Id.* at 271, 275.

Here, unlike in *Poole*, the Northern District of Texas was not Petitioner's "original place of incarceration" nor is it the district in which Petitioner was permanently confined at the time his habeas petition was filed. When his habeas petition was filed, Petitioner was not and had never been in the Northern District of Texas. Thus, Petitioner's original place of confinement and permanent place of confinement could not have been the Northern District of Texas. On the other hand, Petitioner's original place of detention was Virginia—where he was arrested and taken to

13

the Farmville Detention Center. *Poole* does not help Respondents; indeed, *Poole* supports a finding that jurisdiction is proper in this District.

At the time of filing his petition, Petitioner did not have a permanent place of detention. Moreover, the Court questions whether an inquiry into an immigration detainee's permanent place of confinement is prudent because, as evidenced by the facts of this case and others like it, non-citizen detainees may be moved more frequently than those who are criminally incarcerated. Nevertheless, *Poole* does not place jurisdiction in the Northern District of Texas nor the Western District of Louisiana for that matter—which would neither be Petitioner's original nor permanent place of confinement. If *Poole* were to apply, it would place jurisdiction in this District—the original place of Petitioner's detention. Accordingly, the Northern District of Texas does not have jurisdiction to hear Dr. Khan Suri's habeas petition based on the default rules of habeas jurisdiction or after applying *Poole*.

### III.    This Court Has Proper Habeas Corpus Jurisdiction

Absent suspension, the writ of habeas corpus must be available to every detainee. The question here is where Dr. Khan Suri's counsel could have filed. Petitioner argues that the Court should apply the unknown custodian exception because at the time his petition was filed, Petitioner's counsel could not have known who Petitioner's immediate custodian was or where he was confined. Dkt. 47 at 16. Respondents claim that because Petitioner's counsel had access to his NTA approximately three hours before the petition was filed, Petitioner's counsel should have known that the proper jurisdiction in which to file the petition was the Northern District of Texas. Dkt. 49 at 6-7. Based on the NTA, Respondents argue that Petitioner's immediate custodian and district of confinement were known at the time the petition was filed and are known today. *Id.* For all of the reasons stated above, neither Petitioner nor his immediate custodian was in Texas.

14

*A. The Unknown Custodian Exception Applies*

Petitioner landed in the Western District of Louisiana at 5:03 p.m. on March 18, only fifty-six minutes before his counsel filed his petition. Although the default rules may appear to place jurisdiction in the Western District of Louisiana, neither party contends that the Western District of Louisiana is the proper jurisdiction to hear the petition. The Court agrees that this case should not be transferred to the Western District of Louisiana. At the time the petition was filed, neither Petitioner's presence in Louisiana nor movement through Louisiana was ever disclosed. Further, because Petitioner was not booked into the facility in Louisiana until 6:42 p.m., it is not clear who Petitioner's immediate custodian was at the time his petition was filed, if he had an immediate custodian at all.

When a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." *Padilla*, 542 U.S. at 450 n.18. In this situation, the unknown custodian exception applies. The unknown custodian exception provides that a habeas writ does not need to be served on "'the individual with day-to-day control over' the prisoner and instead, "the writ is properly served on the prisoner's ultimate custodian." *Moussaoui*, 382 F.3d at 464-65 (quoting *Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998); and then citing *Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986)) (finding that Secretary of Defense is ultimate custodian, and proper respondent, of individuals in military custody). Here, Petitioner's ultimate custodian is the Secretary of the Department of Homeland Security.[7]

---

[7] During the hearing on this motion, Respondents argued in passing that this Court does not have *in personam* jurisdiction over the Secretary of Homeland Security. This argument was not made in Respondents' Motion to Dismiss. Accordingly, the Secretary of Homeland Security's objection to personal jurisdiction was waived, as would be any similar objection from any Respondent other than Warden Crawford. Fed. R. Civ. P. 12(h) ("A party waives any defense listed in Rule 12(b)(2)-(5) by: . . . (B) failing to . . . make it by motion under this rule."). Moreover, even if this objection

At the time the habeas petition was filed, Petitioner's immediate custodian was unknown. On the evening of March 17, Petitioner was arrested and taken from Rosslyn, Virginia to Chantilly, Virginia. While there, ICE officers told Petitioner that he would be taken to Farmville, Virginia.[8] Petitioner conveyed this information to his wife in the only phone call he was allowed prior to being moved. After being detained in Farmville for only a few hours—in the early morning— Petitioner was taken to a location in or around Richmond, Virginia. ICE officers refused Petitioner's request to call his wife to update her on his location. Then, he was placed on a plane. No official ever informed Petitioner of his imminent movement or that he would be in transit through Louisiana. Nor was Petitioner given the opportunity to update his wife so that she could inform attorneys working on his behalf. Indeed, it is now clear that at 5:59 p.m. on March 18, Petitioner did not have an immediate custodian because he was not yet booked into any detention facility.

Throughout the morning of March 18, Petitioner's counsel worked to understand the circumstances of Petitioner's arrest. At 2:11 p.m., Petitioner's counsel entered his appearance in Petitioner's immigration case and gained access to Petitioner's NTA. In that time, all Dr. Khan Suri's counsel could discover was that Dr. Khan Suri would be taken to the Farmville Detention

---

had not been waived, the Court finds that it can exercise *in personam* jurisdiction over the Secretary of Homeland Security because she regularly transacts business in this district. *See So v. Reno*, 251 F. Supp. 2d 1112, 1128 (E.D.N.Y. 2003) (finding in an immigration habeas case that "[t]here is personal jurisdiction over the Attorney General in New York, since he or she regularly transacts business in New York in an official capacity." (citing *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973))).

[8] Respondents contend that statements of officers to Petitioner are inadmissible hearsay. Dkt. 49 at 12. They are not. Statements of ICE Officers are opposing party statements and are therefore excluded from the rule against hearsay. Fed. R. Evid. 801(d)(2). Further, it is not clear to the Court that these statements are being offered for the truth of the matter asserted. To the extent these statements are being offered to show the effect they had on Petitioner, and not for the truth of the matter asserted these statements are not hearsay. Fed. R. Evid. 801(c).

Center, and that he had a hearing in Texas on May 6. In a little over three hours, and while checking the ICE Online Detainee Locator that provided no new information, Dr. Khan Suri's counsel drafted and filed a habeas petition in this Court. In this timeframe, it is not clear how any other diligent attorney could have known that Petitioner was in Louisiana at the time he filed the petition.

At 5:59 p.m. on March 18, Petitioner's counsel, the individual tasked with filing the petition in the proper jurisdiction and naming the proper respondents, had no indication that Petitioner had been moved to Louisiana. The NTA does not reference Louisiana. Petitioner was not told by any officer that he was going to Louisiana. Even if ICE officers provided Petitioner with accurate updates of where he was being moved, Petitioner was not permitted to contact his wife until the evening of March 19, after his petition was already filed. Effectively, at the time the petition was filed, Petitioner was detained in an unknown location by an unknown custodian.

Moreover, even if it were possible for Petitioner's counsel to have discovered he was in Louisiana at 5:59 p.m., Petitioner's counsel would not have known who to identify as Petitioner's immediate custodian. Petitioner was not booked into the ASF until 6:42 p.m. on March 18— almost an hour after the petition was filed. It is ironic that the Government's first declaration specifically described Petitioner's movements in Eastern Daylight Time. The Second Simon Declaration which indicated when Petitioner was booked into the ASF, was silent as to the time zone. This omission led Petitioner, and initially the Court, to believe that Petitioner was booked into the ASF seventeen minutes *before* his petition was filed. However, only in response to questions from the Court was it made clear that the times referenced in the Second Simon Declaration were in Central Time. Thus, the habeas petition was actually filed forty-three minutes *before* Petitioner was booked into the ASF.

17

To date, Respondents have not identified who Petitioner's immediate custodian was while he was on a plane to Louisiana or while he was in Louisiana before he was booked into the ASF. It is logical to assume that if Respondents could identify the individual Petitioner should have named as his immediate custodian, they would have. Not only was Petitioner's immediate custodian unknown to his counsel at the time of filing his petition, it appears that his immediate custodian at 5:59 p.m. remains unknowable to all, including the Government. In accordance with the unknown custodian exception and ultimate custodian rule, Petitioner named the Secretary of Homeland Security as a respondent in his original and amended petitions. Dkts. 1, 34.

In *Demjanjuk v. Meese*, the D.C. Circuit applied the unknown custodian exception when the petitioner, a suspected war criminal, was held "in a confidential location." 784 F.2d 1114, 1115-16 (D.C. Cir. 1986) (Bork, C.J.).[9] Judge Bork thought "it [wa]s appropriate, in these very limited and special circumstances, to treat the Attorney General of the United States as the custodian" and apply the unknown custodian exception. *Id.* at 1116. The Court recognizes that these are different facts. But what is similar is that the custodian and place of confinement were unknown at the time of filing.

Respondents claim that the Supreme Court in *Padilla* distinguished *Demjanjuk* when the Court declined to apply the unknown custodian exception. Dkt. 49 at 4 (citing *Padilla*, 542 U.S. at 450 n.18). However, in *Padilla*—unlike in *Demjanjuk*—"counsel was well aware of Padilla's presence in South Carolina when she filed the habeas petition." *Id.* at 449 n.17. Further, the Court in *Padilla* found there were no indications of secrecy on behalf of the Government. *Id.* The *Padilla*

---

[9] The Court observes that only Judge Bork heard and decided this case because he "decline[d] to transfer this application" to the district court given that "it [was] absolutely clear from the application that the applicant [was] not entitled to . . . the writ" which obviated the need for hearing and transfer. *Demjanjuk v. Meese*, 784 F.2d 1114, 1115 (D.C. Cir. 1986). In addition, Judge Bork felt transfer was inappropriate "given the imminence of petitioner's extradition to Israel." *Id.*

Court did not reject the unknown custodian exception but merely found that it was inapplicable on the facts before the Court at that time. *Id.* Here, at the time Petitioner's counsel filed his habeas petition, Petitioner's location was unknown, and it appears Petitioner did not have an immediate custodian who could have been named.[10] Accordingly, the Court will apply the unknown custodian exception.

Next, Respondents seize on certain language in the *Demjanjuk* opinion to argue that this Court has been divested of jurisdiction over Dr. Khan Suri's habeas petition because he has been removed from this District. Dkt. 49 at 6. In particular, Judge Bork wrote in *dicta* that if it becomes "known that petitioner is held in a jurisdiction other than this one, a judge of this circuit would be divested of jurisdiction." *Demjanjuk*, 784 F.2d at 1116. Judge Bork provides no analysis explaining how he reaches that proposition. Moreover, as Petitioner argues, this language would permit the government to circumvent *Ex parte Endo*, which "stands for the . . . proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Padilla,* 542 U.S. at 441; *see* Dkt. 47 at 15-16. Then, the Government could withhold the location of an individual, wait to see if and where a petition is filed, then disclose their custodian or location, and claim the court in which the petition was filed is divested of jurisdiction. This result would defeat the purpose of the great writ.

---

[10] Respondents try to avoid the application of the unknown custodian exception by arguing that it is clear that Petitioner is held in the Northern District of Texas, so jurisdiction must only be proper there. Dkt. 49 at 6. As discussed *supra,* jurisdiction is not proper in the Northern District of Texas because Petitioner was not and had never been present in the Northern District of Texas at the time the petition was filed. Therefore, this case should not be transferred to the Northern District of Texas.

19

### B. An Exception to the District of Confinement Rule Applies

Just as the unknown custodian exception provides an alternative to default habeas rules when a petitioner's immediate custodian cannot be ascertained, there must also be an exception when the petitioner's location cannot be determined. In *Padilla*, the Supreme Court forecasted as much when it noted that when a petitioner "is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 450 n.18.

An exception to the district of confinement rule must apply when, after reasonably diligent effort, the district in which the petitioner was confined could not have been determined. Respondents claim that *Padilla* rejected the argument that "the facts available to counsel at the time of filing should govern and the facts as they actually existed at the time of filing should not matter." Dkt. 49 at 6 (citing *Padilla*, 542 U.S. at 449 n.17) (internal quotations omitted). But the Supreme Court never opined either way. *Padilla*, 542 U.S. at 449 n.17. Instead, the Court simply noted that the dissent's reasoning was based on its concern about "Government secrecy," despite there being no such allegation. *Id.* In fact, when Padilla's attorney filed the habeas petition, she identified Padilla's location, stating that he was being held "in segregation at the high-security Consolidated Naval Brig in Charleston, South Carolina." *Id.* (quoting Padilla's habeas petition). Thus, Respondents mischaracterize *Padilla's* reasoning on this point.

The *Padilla* majority does not address whether it would be proper to find jurisdiction based on the facts available to diligent counsel through reasonable effort under the circumstances. Often, as in the situation before the Court, counsel files a habeas petition on behalf of their client. In those situations, counsel is tasked with determining the district in which the petition should be filed and who is the proper respondent to be named. Consequently, habeas jurisdictional rules must be based on discoverable facts regarding where a petitioner was and who was confining him.

Otherwise, courts are left to grapple with jurisdictional questions, manufactured or not, instead of focusing on the merits of the petition. Moreover, limiting the facts to those that could be discovered by diligent counsel constrains the ability of either side to engage in impermissible forum shopping.

To be clear, habeas petitioners do not have a right to be held in a specific place. It strains credulity, however, that a habeas petition that properly named the petitioner's ultimate custodian and was filed in the district where the petitioner resides, was arrested, and was detained cannot be heard in that same district. *See Harris,* 394 U.S. at 291 (emphasizing the importance of flexibility in habeas adjudication). In this case, Petitioner resides in this District, he was arrested in this District, and he was originally detained in this District. The last time Petitioner was permitted to speak to his wife, the only information he had was that he would be detained in this District. Petitioner's counsel worked diligently in less than twenty hours and filed the petition in this District based on the only information that was available to him—that his client was detained in this District. And as stated above, the NTA did not reference Louisiana, nor did the ICE Online Detainee Locator provide information about Petitioner's whereabouts until after the petition was filed. At no point after entering his appearance did Petitioner's counsel receive any notification that Petitioner had been transferred. Although the NTA listed a Texas address as his current residence, it is clear and undisputed that Petitioner was not there and did not arrive there until days later. This is not the forum shopping that habeas jurisprudence seeks to prevent.

The facts before the Court today demand an exception to the district of confinement rule. Justice Kennedy, in his concurrence in *Padilla*, predicted the problem that now faces the Court. There, Justice Kennedy, joined by Justice O'Connor, noted that there should be an exception "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed" or "if the Government

did inform the lawyer where a prisoner was being taken but kept moving him so filing could not catch up to the prisoner." *Padilla*, 542 U.S. at 454 (Kennedy, J. concurring). In these situations, Justice Kennedy believed that "habeas jurisdiction would lie in the district or districts from which [the petitioner] had been removed." *Id.*

At the hearing, the Court posed several questions to Respondents seeking to better understand the circumstances of Petitioner's arrest and detention and clarify the Government's purpose in transporting Petitioner to Texas. The Court asked Respondents: (1) whether it is normal for NTAs to list the address of a detention facility as where the non-citizen currently resides; (2) when the custody determination was made that Dr. Khan Suri would be detained in Texas and which records reflect those facts; (3) how many beds were available in Farmville at the time of Dr. Khan Suri's arrest and how many people were removed from Farmville when Dr. Khan Suri was removed; (4) how and when people are typically moved from Farmville; and (5) to provide any additional information on the decision to move Dr. Khan Suri to Texas—specifically, to explain why Dr. Khan Suri was moved from a facility that had bedspace to a facility that did not. Transcript of May 1 Hearing ("Tr.") at 7:13-14, 8:4-6, 9:13-18, 15:17-21, 16:7-12, 16:17-22, 17:15-16, 17:24-18:3.

Respondents' answers to these questions are either non-responsive or riddled with inconsistencies. First, Respondents appear to make post hoc rationalizations regarding available bedspace in Caroline and Farmville. Respondents originally contended that Petitioner was moved from this District because of "potential overcrowding in Virginia detention facilities." First Simon Decl. ¶ 8.[11] In their supplemental declaration, Respondents represent that there were, in fact, no

---

[11] In response, Petitioner advanced evidence that there was ample bedspace at immigration facilities in Virginia. TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html; ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-

beds for Petitioner in this District because the available beds were either reserved for other arrests, as with Farmville, or only available for emergencies, as with Caroline. Graham Decl. ¶ 8. Was the reason the potential overcrowding or no beds? These representations are plainly inconsistent and are further undermined by the fact that Prairieland Detention Center, where Petitioner is currently held, is overcrowded. Khan Suri Decl. ¶ 22. Moreover, neither representation satisfactorily explains why Dr. Khan Suri would be transferred from a place with, concededly, some bedspace at the time of Petitioner's arrest to a facility that did not have bedspace. It is uncontroverted that Dr. Khan Suri was placed in a dormitory that has a 36-person capacity but has been filled with at least 50 people since he arrived. *Id.* Indeed, Dr. Khan Suri slept on a plastic cot on the floor for two weeks before being moved to a bed. *Id.*

Drawing all inferences in favor of Petitioner, the Court infers that Petitioner's transfer to Texas was not about bedspace. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (acknowledging that a Court is required to make all inferences in favor of a plaintiff when deciding a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing). Indeed, given Respondents' apparent post hoc rationalization that bedspace concerns motivated Petitioner's removal from the District, it appears that Respondents' goal in moving Petitioner was to make it difficult for Petitioner's counsel to file the petition and to transfer him to the Government's chosen forum.

The second issue—Petitioner's NTA—also suggests that Respondents' design was to forum shop and spirit Petitioner away from this District before his counsel could file a petition. The Court asked Respondents whether it was normal for the NTA to list a detention facility as a

---

content/uploads/2022/06/2021-Annual-Review.pdf.; Caroline Detention Facility, *Home* (2025), https://carolinedf.org/. The Court need not rely on this.

non-citizen's current residence.  Respondents assert that NTAs "issued for aliens who will be detained are issued listing the detention facility as the current address" because the non-citizen's location determines the "court and docket, as well as the date and time for initial appearances." Graham Decl. ¶ 10.  As Petitioner notes, however, an NTA, like an indictment or complaint, is designed to "supply an affected party with a single document highlighting certain salient features of the proceedings against him." Dkt. 58 at 3 (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 163-64 (2021)). By statute, an NTA is sufficient if it includes the non-citizen's "most-recent address." 8 U.S.C §§ 1229(a)(1), 1229a(b)(5)(A).  Respondents' statements suggest they were fully aware that listing Petitioner's current residence or place of detention would determine which immigration court would have jurisdiction over his proceedings.[12]  *See* U.S. Dep't. of Just., Imm. Ct. Pract. Man. § 4.2 (2022); 8 C.F.R. § 1003.11; U.S. Dep't. of Just., Immigration Court List – Administrative Control, https://www.justice.gov/eoir/immigration-courtadministrative-control-list (last visited May 3, 2025).  Respondents also knew that the Prairieland Detention Center was not his most recent residence.

Respondents' assertions with respect to the NTA's listed address also appear to be post hoc rationalizations because Respondents provide inconsistent statements on when the decision to detain Petitioner in Texas was made.  The supplemental declaration states that the decision to detain Petitioner was made while he was at the Chantilly Field Office, and that the NTA was issued after the detention facility was decided.   Graham Decl. ¶ 6 (stating that Dr. Khan Suri was transported "to the ERO Washington Office in Chantilly for the purpose of . . . making a decision on a detention location"); *id.* ¶ 9 (stating that "the decision to detain Suri at the Prairieland

---

[12] It is worth noting that ICE failed to notify Dr. Khan Suri's counsel of his transfer despite ICE's policy suggesting that notice to counsel in the event of transfer is standard practice. *See* ICE Policy 11022.1, § 5.3 Notifications in the Event of a Detainee Transfer (Jan. 4, 2012).

Detention Facility was made at approximately 10:00 pm on March 17, 2025"); *id.* ¶ 11 (stating that the NTA was issued "after the detention facility was decided"). This conflicts with Respondents' statement at the hearing that the custody determination to detain Petitioner in Texas was made before the NTA was issued. Tr. 9:7-12.

Here, the undisputed facts show that Petitioner was arrested around 9:30 p.m. outside his home in Rosslyn, Virginia. The Chantilly Field Office is at least a 30-minute drive from Petitioner's apartment building. Therefore, Petitioner could not have been at the Chantilly Field Office at 9:47 p.m. when the NTA, stating he currently resides in Texas, was digitally signed. It appears that, despite Respondents' representation that Petitioner was transported to Chantilly *to* determine his detention location, the decision to detain Petitioner in Texas was actually made *before* 10:00 p.m. and before Petitioner arrived at and was processed in the Chantilly Field Office. Graham Decl. ¶ 6. With these inconsistencies, it is still unclear when the decision to detain Petitioner outside of this District was made. Nonetheless, as stated above, the detention decision appears to have little to no relationship to whether there was available bedspace in Farmville or Caroline.

Lastly, such rapid transfers do not appear to be part of the normal course of operations in this jurisdiction. While rapid transfer of immigration detainees may be typical in some jurisdictions, Petitioner's movement across state lines appears atypical for immigration detainees in this jurisdiction. *Cf. Khalil v. Joyce et al.*, 2025 WL 849803, at *9-*10 (S.D.N.Y. Mar. 19, 2025) ("*Khalil I*") (noting that rapid transfer of Manhattan immigration detainees to New Jersey is routine). A qualified immigration attorney with extensive practice experience in Virginia stated that she has "never seen ICE arrest someone in Virginia and move them as far away as Texas in less than 24 hours." Dkt. 47-2, Declaration of Elizabeth Schmelzel, Esq. ("Schmelzel Decl.") ¶ 5. Although Respondents assert that forty-four people were moved from Farmville with Dr. Khan

25

Suri, they offer no clarifying information to indicate whether they were similarly situated—i.e., whether they were recently arrested like Dr. Khan Suri or whether they had been there for some time and had final orders of removal. Respondents also fail to provide the Court with any additional information regarding the regularity of transfers or the transfer process. Moreover, ICE's own guidance and policies with respect to transfers suggest that Petitioner's movement and Respondents' actions in this case do not conform to the normal course. *See* ICE Directive 11064.3 (2022), available at: https://www.ice.gov/doclib/news/releases/2022/11064.3.pdf; ICE Policy No. 11022.1, §§ 5.2, 5.3 (Jan. 4, 2012).

Accordingly, the fashion in which Petitioner was transferred appears exceptional for immigration detainees who are arrested in Virginia, if not in general. This atypical movement would make it difficult for any diligent lawyer's filings to "catch up" to their client's location. Indeed, it took Petitioner's counsel only three-hours and forty-eight minutes to file the original habeas petition, and yet, he was too slow. Ahmad Decl. ¶¶ 7-8. No diligent lawyer who routinely practices immigration law in this District could have predicted the shepherding of Petitioner from Virginia to Louisiana.[13] The facts at hand demand that the default habeas jurisdictional rules adjust accordingly.

Respondents claim that Petitioner was only in Louisiana transitorily and on his way to his ultimate destination of Texas. Dkt. 26 at 12. It is not readily apparent to the Court that the Government intended to take Petitioner to Texas to be held there awaiting his May 6 hearing. Petitioner was in Louisiana from the evening of March 18 until the evening of March 21. Second

---

[13] Additionally, the Court does not premise its jurisdictional finding on this hypothetical but queries the application of habeas jurisdictional rules if Petitioner's counsel filed the petition just fifty-seven minutes earlier—at 5:02 p.m. on March 18. At that point, Petitioner's plane was in the air. First Simon Decl. ¶ 11.

Simon Decl. ¶ 3. Petitioner stated that on the evening of March 20, two days after his habeas petition was filed in this District, he was told he would be leaving Louisiana to be transferred to New York to be deported. Khan Suri Decl. ¶ 21. Notably, on the same day, the Court entered its order that Petitioner not be removed from the United States until the Court issues a contrary order. Dkt. 7. Only on the following day was Petitioner transferred to Texas.

The Court notes that there has been a pattern of similar movement of immigration detainees in similar cases. *Mahdawi v. Trump et. al.*, 2025 WL 1243135, at *3 (D. Vt. Apr. 30, 2025) (recounting that on the same day he was arrested and served with an NTA, Homeland Security Investigations agents attempted to put Mr. Mahdawi on a plane bound for Louisiana); *Ozturk v., Trump, et al.*, 2025 WL 1145250, at *2-*3 (D. Vt. Apr. 18, 2025) ("*Ozturk II*"), *appeal filed*, *Ozturk v. Hyde et al.*, No. 25-1019 (2nd Cir. Apr. 24, 2025) (detailing that within 24 hours of her arrest, Ms. Ozturk was taken to Methuen, Massachusetts, then to Lebanon, New Hampshire, then to St. Albans, Vermont, then to Burlington, Vermont, and then put on a plane to Louisiana); *Khalil I*, 2025 WL 849803, at *3-*4 (describing that within 48 hours of his arrest, Mr. Khalil was taken to another facility in Manhattan, before being transported to Elizabeth, New Jersey, and then flown to Dallas, Texas, before finally reaching Jena, Louisiana). Each petitioner was arrested on different days and in different regions. What is similar? Each was charged with removability under 8 U.S.C. §1227(a)(4)(C), and the Government attempted to move each outside of their jurisdictions to Louisiana or Texas.

Based on these facts the Court adopts the reasoning of Justice Kennedy's concurring opinion in *Padilla*. Respondents' myriad contradictory explanations combined with the inability for Petitioner's exceptionally diligent counsel to keep up with Petitioner's abnormal and rapid movement across state lines demands more flexible jurisdictional rules. *See Harris,* 394 U.S. at 291. Therefore, the Court finds that jurisdiction should lie in the district from which Petitioner

27

was removed—the Eastern District of Virginia. *See Padilla*, 542 U.S. at 454 (Kennedy, J., concurring).

The Court declines to transfer Dr. Khan Suri's petition to the Western District of Louisiana for the additional reason that doing so would ratify an attempt at forum shopping. When it is possible to apply the immediate custodian rule, that rule "serves the important purpose of preventing forum shopping by a habeas petitioner." *Poole*, 531 F.3d at 273 (quoting *Padilla*, 542 U.S. at 447). Just as a habeas petitioner should not be permitted to forum shop, neither should the United States Government. *See Eisel v. Sec'y of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973) (warning against "the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum"). In fact, the D.C. Circuit's warning in *Eisel v. Secretary of the Army* is particularly prescient considering the United States Government continues to dispute the jurisdictional findings of other district courts in an attempt to force the petitioners to re-file habeas petitions in new jurisdictions. *See Ozturk II*, 2025 WL 1145250; *Khalil II*, 2025 WL 972959. It is not an exercise in forum shopping for Petitioner to file and seek review of his habeas claims in this District—the jurisdiction in which he resides, was arrested, and was originally detained. Instead, forcing Petitioner to litigate his case in Louisiana or Texas for that matter, many states away from his lawyers and family, would meaningfully deprive him of their ability to aid in his representation for the duration of these habeas proceedings.

Moreover, because Petitioner has strong connections to this District, this District has an interest in the adjudication of Petitioner's habeas claims, whereas the Northern District of Texas and the Western District of Louisiana do not. Although it involved different circumstances than the ones before this Court, the Supreme Court's reasoning in *Braden v. 30th Judicial Circuit Court of Kentucky* supports this conclusion. 410 U.S. at 499. There, the Supreme Court found that the default rules of habeas jurisdiction were unworkable for a petitioner who was presently confined

in Alabama but seeking to challenge a detainer lodged against him by the Commonwealth of Kentucky. *Id.* The *Braden* Court made an exception and allowed the petitioner to sue the individual with legal control over his future confinement in Kentucky. *Padilla*, 542 U.S. at 438 (describing the holding of *Braden*). The Court reasoned that "the Western District of Kentucky is almost surely the most desirable forum for the adjudication of [the petitioner's claim]" because the relevant events occurred there, and it would be "no less convenient for the respondent and the Commonwealth of Kentucky" to litigate the petitioner's claims in Kentucky. *Braden*, 410 U.S. at 493-94.

Just as the Court in *Braden* applied "traditional venue considerations" when the default rules became untenable, so too does this Court. *Id.* at 493. First, the Eastern District of Virginia is where Petitioner resides with his wife and children, it is where Petitioner was arrested, and it was where Petitioner was detained from the evening of March 17 until the evening of March 18. *See Poole*, 531 F.3d at 271 (holding that habeas jurisdiction remains in the "original place of incarceration" despite temporary movement to another district). Therefore, the Eastern District of Virginia has a strong interest in hearing Petitioner's claims. Additionally, it works no prejudice to Respondents to litigate in the Eastern District of Virginia. For these reasons, the Court declines to transfer the instant habeas petition to the Western District of Louisiana.

Accordingly, for the foregoing reasons, the Court finds that this Court has jurisdiction to hear Dr. Khan Suri's habeas petition. Respondents' Motion to Dismiss or in the Alternative, Motion to Transfer Venue (Dkts. 24, 25) are denied.

A separate Order will issue.

Entered this 6th day of May, 2025
Alexandria, Virginia

/s/
Patricia Tolliver Giles
United States District Judge

29