IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| Badar KHAN SURI,<br><br> *Petitioner-Plaintiff*,<br><br>v.<br><br>Donald J. TRUMP, in his official capacity as President of the United States;<br><br>Russell HOTT, in his official capacity as Field Office Director of Washington, Immigration and Customs Enforcement;<br><br>Jeffrey CRAWFORD, in his official capacity as Warden of Farmville Detention Center;<br><br>Todd LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement;<br><br>Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security;<br><br>Marco RUBIO, in his official capacity as Secretary of State; and<br><br>Pamela BONDI, in her official capacity as Attorney General, U.S. Department of Justice,<br><br> *Respondents-Defendants*. | Case No. 1:25-cv-480 |

**SECOND AMENDED[1] PETITION FOR WRIT OF HABEAS CORPUS
AND COMPLAINT**

---

[1] Petitioner-Plaintiff files this Second Amended Petition and Complaint pursuant to Fed. R. Civ. P 15(a)(2).

**INTRODUCTION**

1.     This case concerns the government's targeted, retaliatory apprehension, detention, transfer, and attempted deportation of a postdoctoral fellow at Georgetown University based on his family connections, constitutionally protected speech, imputed speech, religion, and national origin. Petitioner-Plaintiff Dr. Badar Khan Suri ("Dr. Khan Suri") is a citizen and national of India and was in the United States in lawful status as a visiting scholar. The Trump administration has openly expressed its intention to weaponize immigration authorities to punish noncitizens whose views are deemed critical of U.S. policy as it relates to Israel. In this case, Respondents-Defendants are targeting Dr. Khan Suri due in part to his protected speech on this issue, but also because of his U.S. citizen wife's Palestinian origins, her constitutionally protected speech, her familial associations, and his and his wife's Muslim religion, culminating, without reason or process, in Dr. Khan Suri's apprehension, arrest, detention, and status termination.

2.     On March 17, 2025, Dr. Khan Suri, a J-1 visa holder, was arrested, detained, and charged with removability under 8 U.S.C. § 1227(a)(4)(C), a rarely used provision of immigration law that allows the government to seek the deportation of an individual "whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States."

3.     This was done pursuant to a federal government policy ("the Policy") to retaliate against and punish noncitizens like Dr. Khan Suri who Respondents perceive to be supportive of Palestinian rights or critical of Israel because of their actual or imputed protected speech, viewpoint, religion, national origin, or associations—including associations with Palestinians.

4.     Under the Policy, Respondents, including Respondent Marco Rubio, the Secretary of State, identify such noncitizens. Once identified, the Department of Homeland Security

("DHS") apprehends and detains them, then transfers them to immigration jails far away from their families and attorneys to jurisdictions that Respondents perceive to be more favorable to them, and seeks to deport them from the United States.

5.    In this instance, pursuant to the Policy, Respondent Rubio identified Dr. Khan Suri and sought to apprehend, detain, transfer, and deport him. Respondent Rubio made a determination (the "Rubio Determination") that Dr. Khan Suri's presence or activities in the United States would compromise a compelling United States foreign policy interest ("Foreign Policy Ground"). Upon information and belief, Respondent Rubio made this determination based on Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, or protected associations, as well as his wife's protected speech, familial relationships, religion, and national origin. Based on the Rubio Determination, DHS agents arrested and detained Dr. Khan Suri, although not required to under immigration law. They then almost immediately transferred him to far-away immigration jails and placed him in removal proceedings.

6.    On March 18, the day following Dr. Khan Suri's arrest, the United States Department of State unilaterally and unlawfully terminated Dr. Khan Suri's J-1 exchange visitor status in the Student and Exchange Visitor Information System ("SEVIS") without notifying him or his qualifying program at Georgetown University. Georgetown University has never suspended or terminated Dr. Khan Suri's J-1 exchange visitor status based on non-compliance with its terms or for any other reason. Rather, the State Department unlawfully terminated Dr. Khan Suri's status as part of the Policy to target and retaliate against Dr. Khan Suri based on his protected speech and association.

7.    The Rubio Determination and the government's subsequent actions, including its detention of Dr. Khan Suri 1,300 miles away from his home from March 18, 2025 until May 14,

2025 (when this Court ordered his release pending adjudication of this Petition), in the same manner as the government did in the cases of Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk, isolating him from his wife, children, community, and legal team, constitute retaliation and punishment for Dr. Khan Suri's actual or imputed protected speech, viewpoint, religion, national origin, and associations, all in violation of the First and Fifth Amendments. Indeed, contemporaneous and subsequent statements by administration officials expressly confirm that Respondents targeted Dr. Khan Suri on these unlawful bases.

8.      The Rubio Determination and Dr. Khan Suri's unjustified detention and transfer also violate his due process rights by targeting him pursuant to an unconstitutionally vague Policy and Determination and subjecting him to unlawfully punitive civil detention.

9.      Respondents' targeting of Dr. Khan Suri based on their discriminatory animus towards his wife's national origin constitutes intentional discrimination in violation of the Equal Protection guarantee of the Fifth Amendment.

10.     The government's unlawful Policy of targeting noncitizens, including Dr. Khan Suri, is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act ("APA"), and carried out in violation of DHS's own policies in violation of the *Accardi* doctrine.

11.     The government's unilateral termination of Dr. Khan Suri's J-1 record in SEVIS is unauthorized, arbitrary and capricious, and contrary to a constitutional right in violation of the APA.

12.     Accordingly, this Court should enjoin the government's implementation of its unlawful Policy, reinstate Dr. Khan Suri's SEVIS record so that he may return to his program at

4

Georgetown, and enjoin Respondents from detaining Dr. Khan Suri based on his protected speech and association.

## PARTIES

13.    Petitioner Badar Khan Suri is a citizen and national of India, and was in the United States in J-1 status as a visiting scholar and postdoctoral fellow. He was duly admitted to the United States on this visa in December 2022. He is married to a U.S. citizen, with whom he has three children: a nine-year-old son and five-year-old twins—a boy and a girl. He and his wife are practicing Muslims. At the time of his arrest, he was teaching a course as an adjunct professor on Majoritarianism & Minority Rights in South Asia at Georgetown University. He hopes to become a university professor and embark on a career in academia and teaching.

14.    Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security. Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, DC 20500.

15.    Respondent Russell Hott is named in his official capacity as the Acting Field Office Director of the Washington Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations within the Washington Field Office's area of responsibility, including overseeing decisions to apprehend, detain, release, and transfer individuals in ICE custody. Respondent Hott was, upon information and belief, Petitioner's custodian at the time he filed his original habeas petition. Respondent Hott's address is Washington ICE ERO Field Office, 14797 Murdock St., Chantilly, VA 20151.

16.     Respondent Jeffrey Crawford is the Director of the Farmville Detention Center where, upon information and belief, Petitioner was detained when Petitioner's initial Petition for Writ of Habeas Corpus and Complaint was filed. Respondent Crawford's address is Farmville Detention Center, 508 Waterworks Dr., Farmville, VA 23901.

17.     Respondent Todd Lyons is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

18.     Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Eastern District of Virginia; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

19.     Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i). In addition to his legal

6

responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Eastern District of Virginia and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, DC 20520.

20.    Respondent Pamela Bondi is the Attorney General of the United States. In this capacity, she routinely transacts business in the Eastern District of Virginia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA; and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, §9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

22.    An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

23.    Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(c)(3) and 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to this action occurred and continue to occur at ICE's Washington Field Office in Chantilly, Virginia within this district. The Washington Field Office directed Dr. Khan Suri's arrest and detention in Rosslyn, Virginia; told Dr. Khan Suri and his wife that he was being taken to the ICE Washington Field Office located in Chantilly, Virginia and then told Dr. Khan Suri that he was being taken to the Farmville Detention Center in Farmville, Virginia. Farmville Detention Center

is Dr. Khan Suri's "original place of incarceration," *see United States v. Poole*, 531 F.3d 263, 275 (4th Cir. 2008), and his last known location at the time this habeas action was filed. To the extent the Washington Field Office and Respondents moved Dr. Khan Suri to Richmond, Virginia, and then to an airport and across the country to Louisiana around the time the original petition was filed, the Washington Field Office prevented Dr. Khan Suri from communicating this information to his wife and counsel.

## FACTS

### *Dr. Khan Suri's Background*

24.     Dr. Khan Suri is an Indian national who grew up in Uttar Pradesh, India. He obtained his undergraduate degree in Humanities, Geography, History and English from Jamia Millia Islamia in New Delhi, India, and his master's degree in Peace and Conflict Studies from the same university. In 2020, he completed his Ph.D. in Peace and Conflict Studies at the Nelson Mandela Center for Peace and Conflict Resolution at the same university.

25.     During the time he was in his master's program, Dr. Khan Suri traveled with a group of fellow students and prominent members of civil society to Gaza in 2011 as a humanitarian aid convoy. There, he met his future wife, Mapheze Saleh, who was volunteering along with other college students as a translator for foreign delegations. Dr. Khan Suri returned to India after this trip, but continued to communicate with Ms. Saleh.

26.     Ms. Saleh is a United States citizen of Palestinian descent who was born in Missouri. She lived in the United States until she was five years old. At that time, she moved to Gaza with her mother, but returned to the United States every summer to visit her father, who continued to reside in the United States.

27.     Ms. Saleh's father is Ahmed Yousef, who is the director of the House of Wisdom for Conflict Resolution and Governance and is a Professor of International Relations at the Islamic University of Gaza. Mr. Ahmed Yousef is an academic. Between 2006 and until he retired from civil service in 2010, he worked as a political advisor to the Prime Minister of Gaza and as deputy foreign minister in Gaza. The House of Wisdom for Conflict Resolution and Governance works towards peace and conflict resolution in Gaza.

28.     In 2013, Dr. Khan Suri returned to Gaza to ask for Ms. Saleh's hand in marriage. At that time, Dr. Khan Suri met Ms. Saleh's father for the first time, and asked for his blessing to marry Ms. Saleh. The couple became engaged, and Dr. Khan Suri again returned to India. He has not traveled to Gaza since, or seen his father-in-law in person since.

29.     Since marrying Ms. Saleh, Dr. Khan Suri would speak by phone with his father-in-law every once in a while about family matters and his academic pursuits. They would usually speak annually on Eid—the two main annual Islamic holidays—to exchange pleasantries. Since Dr. Khan Suri's wife and children arrived in the United States in 2023, he has not spoken directly with his father-in-law.

30.     In 2013, Ms. Saleh moved to New Delhi, India and she and Dr. Khan Suri were married. They remained in New Delhi, where they had three children, until Dr. Khan Suri moved to the United States in late 2022, and his wife and children reunited with him there in 2023.

31.     After completing his Ph.D., Dr. Khan Suri applied for and received a postdoctoral fellowship at Georgetown University at the Alwaleed Bin Talal Center for Muslim-Christian Understanding. Dr. Khan Suri and his wife wished to move to the United States because it ensures religious freedom for all, and they wanted to raise their children in a society that values religious tolerance.

32.     On December 10, 2022, Dr. Khan Suri arrived in the United States on a J-1 exchange visa to begin his fellowship at Georgetown, which began in January 2023. His wife and children arrived in the United States in November 2023. His children were admitted to the United States on derivative J-2 visas, and thus are dependent on their father's status to enter and remain in the country. He fears that his detention and threatened removal, as well as his SEVIS record termination, could put them at risk as well. The family lives together in Rosslyn, Virginia.

33.     After the war in Gaza began in October 2023, Ms. Saleh lost several family members and friends and she began posting on social media, sharing information about the events occurring in Gaza.

34.     On not more than a handful of occasions, Dr. Khan Suri also made social media posts expressing support for the Palestinian people, criticizing the death toll in Gaza, affirming international law principles, and criticizing U.S. support for Israel's war in Gaza.

35.     Because of Ms. Saleh's identity as a Palestinian, her father's former role in the Gazan government, and the couple's social media posts, both Dr. Khan Suri and his wife have recently been doxxed. In particular, prior to Dr. Khan Suri's detention, at least three private groups had published information about them: Camera.org ("The Committee for Accuracy in Middle East Reporting and Analysis"), a lobbying and media monitoring group that highlights and criticizes the pro-Palestine speech of American Muslims; Canary Mission, an anonymously run website that creates profiles of individuals who support Palestinian rights; and the Campus Watch project of the Middle East Forum, a pro-Israel think tank. Ms. Saleh is featured on the Canary Mission website with her photograph, academic affiliation, and former volunteer work, and the site identifies Dr. Khan Suri as her husband. The couple has also been the subject of several Campus Watch articles.

***The Trump Administration's Hostile Campaign Against Noncitizens It Perceives as Supporting Palestinian Rights***

36.    Respondents' retaliation against Dr. Khan Suri is one application of Respondents' Policy to apprehend, detain, transfer, and deport noncitizens whom Respondents perceive are supportive of Palestinian rights or critical of Israel, because of their actual or imputed speech, viewpoint, religion, national origin, or protected associations, including associations with Palestinians.

37.    In the fall of 2023, thousands of students across the United States from a wide range of racial, ethnic, religious, and socioeconomic backgrounds began organizing on their campuses, many criticizing what they saw as the steadfast support of their universities and the U.S. government for Israel's policies in Gaza. Like Dr. Khan Suri and Ms. Saleh, these students expressed concern about the death toll in Gaza as a result of Israel's military operations.

38.    These campus protests resulted in opponents of these students' messages— including President Donald J. Trump—mischaracterizing campus speech in favor of Palestinian rights or critical of Israel as inherently supportive of Hamas and antisemitic. For example, in several instances, President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[2]

39.    During his campaign for re-election, President Trump repeatedly vowed to use visa revocations as a tactic to pursue his policy of silencing activities on university campuses that were supportive of Palestinian rights or critical of Israel.

---

[2] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur.

40.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[3]

41.     In the spring of 2024, Trump promised campaign donors that he would deport students advocating for Palestinian rights to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[4]

42.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

***Respondents Adopt Unlawful Policy to Apprehend, Detain, Transfer, and Deport Noncitizens Whose Speech and Associations It Finds Objectionable***

43.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public

---

[3] Andrea Shalal & Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29.

[4] Josh Dawsey, Karen DeYoung and Marianne LeVine, *Trump told donors he will crush pro-Palestinian protestors*, Washington Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors.

[5] @marcorubio, *X* (Oct. 15, 2023, 4:24 p.m.), https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January 29, 2025.

44.    Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's overly broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including advocacy for Palestinian human rights.

45.    Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[6] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens [sic] who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

---

[6] Executive Order 14188 refers to Executive Order 13899 for "interpretative assistance" regarding antisemitism. That Executive Order was issued by President Trump in 2019, 84 Fed. Reg. 68779 (Dec. 11, 2019), and it refers to the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism. The IHRA definition of antisemitism includes criticism of Israel that is clearly protected under the First Amendment, such as "drawing comparisons of contemporary Israeli policy to that of the Nazis" or "claiming that the existence of a State of Israel is a racist endeavor." International Holocaust Remembrance Alliance, *Working definition of antisemitism*, https://holocaustremembrance.com/resources/working-definition-antisemitism.

The fact sheet did not clarify what would result in a noncitizen being categorized as a "Hamas sympathizer."

46.     In response to these Executive Orders and as part of an escalating attack on the core political speech at issue, certain groups opposed to Palestinian rights protests began publicizing the names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students and faculty who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line, or publicly flagged names to U.S. Government official accounts.

47.     For example, organizations like the Middle East Forum, Canary Mission, and Betar USA have identified and/or submitted to the Trump Administration the information of students, faculty, and others who have advocated for Palestinian rights, calling for their deportation. Many of those identified by these groups have then been arrested and detained by ICE.

48.     In March 2025, media reports described widespread fear of retaliation for speech supportive of Palestinian rights among noncitizen students, faculty, and other university affiliates, noting that the executive orders "already appear to be chilling political activism."[7]

49.     On or before March 5, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Dr. Khan Suri.

50.     On March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial intelligence driven effort to "cancel the visas of foreign nationals who

---

[7] Ray Sanchez, CNN, *'Rules aren't clear anymore': Trump crackdown on student protestors send shock waves across US universities* (Mar. 18, 2025) available at https://www.cnn.com/2025/03/16/us/mahmoud-khalil-columbia-protests-free-speech/index.html.

appear to support Hamas or other designated terror groups."[8] Respondents would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[9] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

51.    Under the Policy, the Trump Administration, including Respondent Rubio, would identify noncitizen students or faculty who they perceived were supportive of Palestinian rights or critical of Israel, based on their speech, imputed viewpoint, religion, or protected associations. Secretary of State Rubio would then revoke the visas or green cards of the identified individuals, including by making a determination, under 8 U.S.C. § 1227(a)(4)(C)(i), that he had "reasonable grounds to believe" that a noncitizen's presence or activities in the United States "would have potentially serious foreign policy consequences for the United States" ("Foreign Policy Ground"). Although not required to mandatorily detain such individuals under the Immigration and Nationality Act, e.g., 8 U.S.C. § 1226(c), DHS would apprehend and detain such individuals and transfer them in violation of ICE Policy 11022.1, in an effort to deport them quickly and thwart jurisdiction in states the government perceived to be less favorable to it in defending against challenges to the Policy.

52.    Under 8 U.S.C. § 1182(a)(3)(C)(iii), the Secretary of State's decision to refuse entry or deport a noncitizen on this ground cannot be based on the noncitizens "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless he "personally determines that" the noncitizens admission or

---

[8] Marc Caputo, *Scoop: State Dept. to use AI to revoke visas of foreign students who appear "pro-Hamas,"* Axios (Mar. 6, 2025), https://www.axios.com/2025/03/06/state-department-ai-revoke-foreign-student-visas-hamas.

[9] *Id.*

continued presence in the United States "would compromise a compelling United States foreign policy interest."  The Secretary then has to notify certain members of Congress regarding this determination. 8 U.S.C. § 1182(a)(3)(C)(iv).[10]

***Application of the Policy and the Foreign Policy Ground to Noncitizens Whose Views the Trump Administration Finds Objectionable***

53.    On the evening of March 8, 2025, DHS agents first implemented the Policy when they arrested Mahmoud Khalil in New York under the Foreign Policy Ground and transferred him to New Jersey and then to an immigration jail in Louisiana. Khalil is a student at Columbia University in New York who had been involved in the protests at the University against Israel's military actions in Gaza.

54.    The next day, on March 9, Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."

55.    On March 10, President Trump issued a social media statement confirming that Khalil was targeted for his activism and vowed that other student protesters would be targeted as well: "ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the Campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity . . . We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."

56.    On March 12, Secretary of State Rubio stated at a press conference, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your

---

[10] These requirements, which appear under the INA section on grounds of inadmissibility, are incorporated into the INA's foreign policy deportability ground by reference. *See* 8 U.S.C. § 1227(a)(4)(C)(ii).

country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities . . . we're gonna kick you out."

57.     In the days after Mr. Khalil's arrest, there were reports of other instances of application of the apprehend, detain, transfer, and deport Policy.

58.     On March 13, Secretary of Homeland Security Kristi Noem announced that Leqaa Kordia, who had also participated in student protests and had been arrested on Columbia's campus in April 2024, was arrested by ICE in New Jersey and transferred to an immigration jail in Alvarado, Texas.

59.     On March 26, 2025, six plainclothes ICE officers arrested Rumeysa Ozturk, a Turkish Ph.D. student at Tufts University, who DHS alleges, "engaged in activities in support of Hamas." Ms. Ozturk co-authored an op-ed in her university's newspaper criticizing the university's response to students' call to divest from companies with ties to Israel's military action in Gaza. She was transferred to an immigration jail in Louisiana.

60.     On March 27, in response to a question about Rumeysa Ozturk, Respondent Rubio said that the State Department may have revoked more than 300 visas, saying "Every time I find one of these lunatics, I take away their visas."

61.     And on April 14, 2025, DHS arrested and detained Mohsen Mahdawi, a Palestinian lawful permanent resident who co-founded Columbia University's Palestinian Student Union and organized campus protests against Israel's military actions in Gaza. Mr. Mahdawi was arrested at his naturalization interview, after which DHS attempted to put him on a plane to Louisiana almost immediately—within only a couple of hours of his arrest. Mr. Mahdawi remained in the district only because the government agents with custody of him arrived at the airport too late for him to

board a scheduled flight and a district court entered an order restricting his transfer out of the district before a new flight could be arranged.

***Dr. Khan Suri's Retaliatory Apprehension, Detention, and Transfer***

62.    On the evening of March 17, 2025, Dr. Khan Suri was coming back home from teaching and attending iftar (the evening meal eaten to break the daily fast during the holy month of Ramadan). He noticed a dark-colored vehicle that appeared to be following him and several other black, unmarked cars near his apartment building. As he was about to enter the building, a man wearing a face covering and dark military-like clothing approached him and asked if he was Badar. Dr. Khan Suri answered that he was. He noticed that several other officers were present nearby.

63.    Dr. Khan Suri called his wife and asked her to come downstairs and bring his passport and documents because he was being detained. The officers then handcuffed Dr. Khan Suri and put him into one of the unmarked vehicles.

64.    After his wife arrived and asked the officers who they were, they responded they were from "Homeland Security." When he was in the car, Dr. Khan Suri asked that his wife be allowed to give him his passport and documents. Ms. Saleh brought the documents from inside the home, but the officers did not allow her to hand them to Dr. Khan Suri. Instead, the officers took Dr. Suri's passport and DS-2019 form.

65.    Dr. Khan Suri repeatedly asked why he was being arrested. An officer told him that his student visa had been revoked. Dr. Khan Suri clarified that he had an exchange visa, not a student visa. The officer told him it was the same thing, and that it was also revoked. Once he was in the car, one of the officers stated to Dr. Khan Suri that he was being arrested because of his "social media," and that someone at a very high level at the Secretary of State's office does not

18

want him there. One of the officers told him that he was going to be deported to his country. When Dr. Khan Suri asked when he would be deported, the officer responded: "today."

66.    Dr. Khan Suri was first taken to the ICE Washington Field Office in Chantilly, Virginia, where officers took his fingerprints and DNA swabs and completed paperwork. The ICE officers told Dr. Khan Suri that they were aware that he was not a criminal and had not done anything bad. They informed him that he would be transferred to the detention center in Farmville, Virginia, where he would be held, and that he had a hearing in immigration court in Texas on May 6. They allowed him to call his wife to relay this information.

67.    Dr. Khan Suri was then driven to the Farmville Detention Center, where he arrived in the middle of the night. He was under the impression that he would remain there until he was either deported or released. He was refused pre-dawn food and water at Farmville Detention Center despite his repeated requests.

68.    He was then moved to the ICE office in Richmond, Virginia, where he arrived around 6:00 a.m. on March 18. There, he was put in a cell and made to sit on a small bench, shackled. He was also denied permission to call his wife.

69.    Later that day, Dr. Khan Suri was transported to an airport and loaded on an airplane. He was kept shackled at the hands, waist and ankles. The plane was old, and the flight turbulent. When using the bathroom on the plane, he was not permitted to close the door or remove his shackles. He was distressed and confused, and terrified that the plane might crash. He was not told where he was being flown, and feared he was being deported.

70.    The plane landed in Louisiana, and he was taken to the Alexandria, Louisiana Staging Facility, where he was held for three days. While in Louisiana, he expected to be deported soon, as multiple deportation flights were departing daily from Alexandria. One officer referred to

the facility as a "super deportation center" and said that he should expect to be deported at any time.

71. While in the Alexandria Staging Facility, Dr. Khan Suri was denied food and water in accordance with his Ramadan fasting accommodation needs. He was also punched in the back of the knee by guards removing his ankle shackles causing him ongoing pain.

72. On the evening of March 20, an officer at the Alexandria Staging Facility told Dr. Khan Suri that he would be sent to New York the next day.

73. On March 21, he was then driven from Alexandria, Louisiana to Texas. He arrived at Prairieland Detention Center in Alvarado, Texas at around 8:00 p.m. Because he had fasted throughout the day in observance of Ramadan, he again asked for food, but was denied.

74. When he arrived in Texas, Dr. Khan Suri was not assigned to a bed in a dorm. Instead, he was housed in the "TV room," a common room where the television is on every day from 5:00 a.m. to 2:00 a.m. He was given a plastic frame that rests on the floor with a thin plastic mattress to sleep on, called a "boat bed," and no pillow. Due to these conditions, Dr. Khan Suri had pain in his ribs and was unable to sleep.

75. Dr. Khan Suri requested religious accommodations, including Halal food, Ramadan fasting accommodations, a Quran, and a prayer mat. The only book available to him was the Bible. After approximately five days, he finally received Halal food. On April 2, officers came and told him that he had complained through his lawyer about his religious accommodations and asked him for more details. After Dr. Khan Suri reaffirmed his needs, he was given a prayer mat, a Quran, and provided a space on a bed in the dorm, outside of the TV room.

76. Dr. Khan Suri was issued a bright red uniform, usually reserved for detained individuals classified as high security based on their criminal history, alleged affiliations to

20

criminal organizations, or institutional record. When he inquired about the reason for this, he was informed that he is classified as high-security based on his association with a known criminal group.

77.    Due to his classification and security protocols at the facility, Dr. Khan Suri was only permitted two hours per week of recreation. His movement within the facility was severely limited—he was not permitted to work or spend more time outside his dorm.

78.    Dr. Khan Suri and other individuals detained in Prairieland Detention Center were given used, dirty underclothing to wear and fed inadequate, unhealthy food.

79.    Dr. Khan Suri's detention has had profound negative impacts on his family. His wife and children missed him dearly and suffered every day that he was absent from their home. His children kept asking their mother when their father would come home. Dr. Khan Suri normally holds his older son every night at bedtime, helping him fall asleep. During his detention, his son cried uncontrollably and stopped speaking. He was worried especially about his older son. These harms would recur if Dr. Khan Suri is re-detained.

80.    As a result of his arrest, detention, and loss of status, Dr. Khan Suri has been unable to speak freely about matters of public importance, including about Palestinians in Gaza and the federal government's targeting of noncitizens associated with Palestinian advocacy. He was also prevented from freely associating with his wife and family during his detention (and would be again if re-detained).

***DHS's Apprehension of Dr. Khan Suri is Part of a Campaign to Suppress Protected Speech Through Arrest, Detention, Transfer, and Deportation***

81.    On March 19, Tricia McLaughlin, the DHS Assistant Secretary for Public Affairs, misleadingly posted on X that "Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media. Suri has close

21

connections to a known or suspected terrorist, who is a senior advisor to Hamas. The Secretary of State issued a determination on March 15, 2025 that Suri's activities and presence in the United States rendered him deportable under INA section 237(a)(4)(C)(i)."[11]

82.    She did not specify what social media posts she was referring to; what "close connection" she was referring to; or who the "known or suspected terrorist" was.

83.    On April 29, DHS's Office of Public Affairs sent an email update to subscribers with the subject line "100 Days of Making America Safe Again," citing Dr. Khan Suri's arrest as an example of "returning common sense to our legal immigration system and national security by revoking visas of terrorist sympathizers." The email noted, "ICE arrested Badar Khan Suri, a Georgetown foreign exchange student whose father-in-law is a senior advisor to Hamas."[12]

84.    On May 8, DHS posted on its official X account that "[t]he media's 'Georgetown scholar' is the son-in-law of a senior advisor to the Hamas terrorist group and was actively spreading Hamas propaganda and antisemitism on social media."[13]

85.    The Rubio Determination was exclusively motivated by Dr. Khan Suri's protected and imputed speech, viewpoint, religion, national origin, and protected associations. Public statements by government officials, up to and including the President and Secretary of State in cases for similarly situated noncitizens, invoking the same charge under 8 U.S.C. § 1227(a)(4)(C)(i), establish that Respondents are punishing and attempting to silence Dr. Khan Suri by apprehending, transferring, and detaining him.

---

[11] @TriciaOhio, *X* (March 19, 2025), https://x.com/TriciaOhio/status/1902524674291966261.

[12] Press Release, 100 Days of Making America Safe Again (April 29, 2025), https://www.dhs.gov/news/2025/04/29/100-days-making-america-safe-again.

[13] @DHSgov, *X* (May 8, 2025), https://x.com/DHSgov/status/1920461965744357656.

86.     When Dr. Khan Suri was booked at Chantilly, an ICE officer who was involved in his booking informed him that they knew he was not a criminal and did not do anything bad. He was also told by the arresting officer that someone at a very high level at the Secretary of State's office "does not want you here," confirming that Dr. Khan Suri was being targeted in a retaliatory manner pursuant to the Policy. The Foreign Policy Ground expressly prohibits the Secretary of State from excluding or conditioning entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Dr. Khan Suri to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

87.     Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

88.    Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794). As an example, the same House Report on the amendment shared the case of the Shah of Iran as an illustration of where his "mere entry into the United States could [have resulted] in imminent harm to lives or property of United States persons abroad or to property of the United States government abroad." *Id.*

89.    Respondents' failure to follow the procedures specified in the law they relied on to arrest Dr. Khan Suri, along with the statements by Respondents and other government officials, clearly demonstrate that the sole reason for Dr. Khan Suri's apprehension, transfer, and detention is his actual and imputed protected speech, viewpoint, religion, national origin, and protected associations.

### *DHS Policies Related to First Amendment Activity and Transfers*

90.    DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to transfers. Upon information and belief, these directives and policies were still operative when Dr. Khan Suri was detained and transferred.

91.    On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

24

92.     On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

93.     ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

94.     The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

95.     The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

96.     Additionally, ICE Directive 11064.3, "Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults" requires the Field Office Director to refrain from transferring detained noncitizens outside of the Field Office's area of responsibility where their child or children are located unless dictated by exceptional circumstances or court order. Even when transfer is dictated, the Field Office Director must place the noncitizen as close as practicable to the minor child or children.

97.     At the time of his transfer to Louisiana and then Texas, Dr. Khan Suri had a wife and three young children, and an attorney of record, in Virginia.

98.     Upon information and belief, there was no justification provided for the transfers to Louisiana and Texas, and the transfers were not necessary. Virginia has two large, dedicated ICE facilities, Farmville Detention Center[14] and Caroline Detention Facility,[15] with collectively over 900 beds.

99.     Both facilities were operating nowhere near capacity at the time of Petitioner's apprehension. On March 17, 2025, the day of Dr. Khan Suri's arrest, ICE's bimonthly report to Congress demonstrates that the average daily population at Farmville Detention Center and Caroline Detention Facility was 488 and 284,[16] with capacities of 732 and 336, respectively. Farmville was only using 66% of its capacity and Caroline was only using 84% of its capacity.

100.    Upon information and belief, and contrary to the above directives and policies, DHS has issued a directive that all individuals who are subject to the Policy be transferred to detention centers in the south of the United States to jurisdictions that Respondents perceive will be more favorable to them, and where they will be far away from their families and attorneys, and therefore unable to promptly challenge their detention. Consistent with such a directive, three other individuals – Mahmoud Khalil, Leqaa Kordia, and Rumeysa Ozturk – were transferred under

---

[14] ICE, Farmville Detention Center, *Memorandum of Record* (June 6, 2022), https://ica-farmville.com/wp-content/uploads/2022/06/2021-Annual-Review.pdf ("The facility has 732 general population housing unit beds").

[15] Caroline Detention Facility, *Home* (2025), https://carolinedf.org/#:~:text=The%20Caroline%20Detention%20Facility%20(CDF,a%20part%20 20of%20the%20installation ("The Caroline Detention Facility (CDF) is a 336-bed correctional facility").

[16] TRAC Reporting, (March 17, 2025) https://tracreports.org/immigration/detentionstats/facilities.html.

similar rushed circumstances from New York, New Jersey, and Massachusetts, respectively, to Louisiana and Texas, and a fourth individual—Mohsen Mahdawi—was scheduled to depart Vermont on a plane to Louisiana within a few hours of his arrest.

***SEVIS Termination***

101.    Generally, a citizen of a foreign country who wishes to enter the United States for a temporary stay must be first granted a nonimmigrant visa. Exchange visitor (J) visas are nonimmigrant visas for individuals to participate in exchange visitor programs in the United States.

102.    Congress established a statutory basis for exchange visas under 8 U.S.C. § 1101(a)(15)(J), requiring that the noncitizen's entry be for the purpose of activities such as teaching, instructing or lecturing, studying, observing, or conducting research. The J-1 visa program is designed to promote the interchange of people, knowledge, and skills, in the fields of education, arts, and science.

103.    While the J-1 visa *document* itself grants a recipient the right to enter the United States for the specific purposes articulated in statute, an individual's J-1 *status* is a different concept. An individual's status refers to the exchange visitor's general classification within the immigration system and the set of regulations that govern the visitor's basis for being in the United States.

104.    Recipients of J-1 status must be sponsored by an exchange program that has been approved and designated as such by the State Department. To obtain formal approval as a J-1 sponsor program, an institution must first file an application through the SEVIS system. *See* 22 C.F.R. § 62.5.

105.    SEVIS is a centralized database maintained by the Student Exchange Visitor Program ("SEVP") within ICE and used to manage information on nonimmigrant students and exchange visitors and track their compliance with the terms of their status.

106.    An approved J-1 sponsor program must designate a "Responsible Officer," who is responsible for, in part, "all official communications" with DHS and the State Department relating to the program. 22 C.F.R. § 62.11(c). Under 22 C.F.R. § 62.45, the "Responsible Officer" must report through SEVIS to SEVP when an exchange visitor fails to maintain insurance coverage, engages in unauthorized employment, or is involuntarily suspended or terminated from an exchange program. SEVIS termination is governed by SEVP policy and regulations.

107.    Once admitted in J-1 status, an individual is granted permission to remain in the United States for the duration of status as long as they continue to meet the requirements established by the regulations governing their visa classification in 8 C.F.R. § 214.2(j) and 22 C.F.R. § 62.45, such as avoiding unauthorized employment. This status is reflected in the person's SEVIS record. The use of SEVIS is mandatory. 8 C.F.R. § 214.2(j)(1)(vii).

108.    DHS regulations distinguish between two separate ways an exchange visitor may fall out of status: (1) an exchange visitor who "fails to maintain status," and (2) an agency-initiated "termination of status."

109.    The first category, failure to maintain status, involves circumstances where an individual voluntarily or inadvertently falls out of compliance with the J-1 visa requirements, for example by completing the program early, engaging in unauthorized employment, or other violations of their status requirements under 22 C.F.R. § 62.45. In addition, 8 C.F.R. §§ 214.1(e)-(g) outlines specific circumstances where certain conduct by *any* nonimmigrant visa holder, such as engaging in unauthorized employment, providing false information to DHS, or being convicted of a crime of violence with a potential sentence of more than a year, "constitutes a failure to maintain status."

110.    The second category, termination of status, can occur only under the limited circumstances set forth in 8 C.F.R. § 214.1(d), which only permits the government to terminate status when: (1) a previously granted waiver under 8 U.S.C. §§ 1182(d)(3) or (4) is revoked; (2) a private bill to confer lawful permanent residence on the individual is introduced in Congress; or (3) DHS publishes a notification in the Federal Register identifying national security, diplomatic, or public safety reasons for termination of the exchange visitor's status. DHS and the State Department cannot otherwise unilaterally terminate the exchange visitor's status. *See Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 185 n.100 (3d Cir. 2019); *see also* 9 FAM 403.11-3(B).

111.    Because the termination of J-1 exchange visitor status is distinct from the revocation of a J-1 visa, even if DHS or the State Department revokes a J-1 visa, this does not constitute failure to maintain J-1 status and cannot therefore be a basis for SEVIS termination. An individual who has not been determined to have violated their J-1 status, even if their visa is revoked, cannot have a SEVIS record terminated based on 8 U.S.C. § 1227(a)(1)(B) (revocation of nonimmigrant visa) or 8 U.S.C. § 1227(a)(4)(C)(i) (foreign policy grounds), or any deportability ground for that matter.

112.    Dr. Khan Suri was participating in the J-1 exchange visitor program as a "research scholar" which is "a foreign national whose primary purpose is conducting research, observing, or consulting in connection with a research project at research institutions, corporate research facilities, museums, libraries, post-secondary accredited academic institutions, or similar types of institutions. A research scholar may also teach or lecture where authorized by the sponsor." 22 C.F.R. § 62.4(f).

113.    On the morning of March 18, 2025, within hours of Dr. Khan Suri's arrest, the State Department unilaterally and unlawfully terminated his SEVIS record as part of its Policy to target and retaliate against Dr. Khan Suri based on his protected speech and association. Dr. Khan Suri remained in active J-1 status at all times until his SEVIS record was terminated.

114.    Neither DHS nor the State Department ever provided Dr. Khan Suri or Georgetown University any notice that his SEVIS record or J-1 status had been terminated. Instead, after hearing about Dr. Khan Suri's arrest, Georgetown's Responsible Office viewed Dr. Khan Suri's SEVIS record on the morning of March 18, 2025, and saw that it had been terminated by the State Department earlier that same morning. The first reason given for the termination at 8:52 AM was "No Show" but that was amended at 9:19 AM to "Other – Failure to Maintain Status." Dr. Khan Suri's SEVIS record also showed that the J-2 status of his three children was terminated on March 15, 2025, three days prior to Dr. Khan Suri's status termination, for the stated reason "Terminated When J-1 Was Terminated."

115.    While a program sponsor, such as Georgetown University, may terminate an exchange visitor's participation in its program for certain reasons, 22 C.F.R. § 62.40, Georgetown did not terminate Dr. Khan Suri's participation in its program and made no alterations to his SEVIS record around the time of his arrest and detention. Georgetown's Responsible Officer did not provide any notification to either DHS or the State Department that would have led to the revocation of Dr. Khan Suri's visa or the termination of his SEVIS record.

116.    The termination of his SEVIS record reflected the government's unilateral termination of Dr. Khan Suri's exchange visitor status. Without his status, Dr. Khan Suri can no longer participate in his post-doctoral program, pursue his research and writing, or teach his course at Georgetown. Not being able to work and participate in his post-doctoral program upon his pretrial

release on bond has placed him and his family in an extremely difficult financial position, as his salary is the family's primary source of income. It has also hindered his professional development as an academic and may negatively impact his future employment opportunities. And it has resulted in the termination of his children's J-2 status.

117.    The immigration court has no ability to review Dr. Khan Suri's SEVIS termination because the process is collateral to his removal. *See Nakka v. United States Citizenship & Immigr. Servs.*, 111 F.4th 995, 1007 (9th Cir. 2024); *Fang*, 935 F.3d at 183. There is also no administrative appeal of a denial to reinstate J-1 status. The termination of his SEVIS record constitutes final agency action for purposes of the APA. *Id*. at 185.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the First Amendment to the United States Constitution**
*Freedom of Speech and Religious Exercise*

118.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition-Complaint as if fully set forth herein.

119.    The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . or abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I.

120.    The First Amendment protects past, present, and future speech, including speech by noncitizens. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). Government discrimination against a particular viewpoint on a given subject matter is an "egregious" First Amendment violation that "is presumptively

31

unconstitutional." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (cleaned up). "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). As noted *infra*, the First Amendment, along with the Fifth Amendment, also protects the right to expressive and intimate association.

121.    The Rubio Determination and Policy and Dr. Khan Suri's targeting, apprehension, transfer, detention, and SEVIS record termination violate the First Amendment because they: retaliate against and punish Dr. Khan Suri for his or his wife's past protected speech, or speech imputed to him or his wife as a result of his family relationship, and for his religious exercise as a practicing Muslim; prevent him from freely speaking and exercising his religion (through detention and SEVIS record termination); attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States; deprive audiences of his present and future speech on matters of public concern; and chill other individuals who express support for Palestinian rights.

122.    These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Dr. Khan Suri and those similarly situated, in government officials' own telling, the result of their disagreement with his religious exercise and his protected speech and the viewpoint it expresses.

**SECOND CLAIM**

**Violation of the First Amendment and the Due Process Clause of the Fifth Amendment
to the United States Constitution**
*Freedom of Association*

123. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

124. The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." This means "[i]n our jurisprudence guilt is personal" such that "when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct… that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales v. United States*, 367 U.S. 203, 224–25 (1961). Simply put, "guilt by association is a philosophy alien to the traditions of a free society." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

125. Respondents' invocation of the Policy and Rubio Determination to apprehend, transfer, and detain Dr. Khan Suri, as well as to terminate his SEVIS record, rests largely—and impermissibly—on his association with his wife, her protected speech, her national origin, and her familial background. Respondents are retaliating against and punishing Dr. Khan Suri based on an attenuated chain of familial associations: his marital tie to his wife, her familial tie to her father, and her father's former role in the government of Gaza.

126. Mere association is insufficient grounds to impart liability precisely because the Fifth Amendment's Due Process clause mandates a deprivation of liberty must be premised on a finding of "personal guilt." *Scales v. United States*, 367 U.S. at 224; *see also United States v. Hammoud*, 381 F.3d 316, 328 (4th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005).

33

127.    The Constitution protects both expressive association—the "right to associate for the purpose of engaging in those activities protected by the First Amendment"—and intimate association—*i.e.*, one's "choices to enter into and maintain certain intimate human relationships [that] must be secured against undue intrusion by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Freedom of intimate association is a "fundamental element of personal liberty" guaranteed by the Due Process Clause. *Id*. It also stems from the First Amendment right to freedom of association. *See Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 282 (4th Cir. 1991). Marriage is the paradigmatic example of intimate association. *Obergefell v. Hodges*, 576 U.S. 644, 646 (2015) ("Decisions about marriage are among the most intimate that an individual can make").

128.    DHS' allegation that Dr. Khan Suri maintains "close connections with . . . Hamas" is premised, if on any facts at all, solely on his intimate association—his marriage—with his wife, and her national origin and parentage. Thus Dr. Khan Suri has no "personal guilt" necessary to deprive him of his rights under the Due Process Clause. To determine that Dr. Khan Suri's fact of marriage establishes a "sufficiently substantial" relationship to his wife's *constitutionally protected* speech—or *any* of his father-in-law's alleged beliefs, statements, activities, or associations—to manifest "personal guilt" justifying his deportation is guilt by association in direct contravention of the First and Fifth Amendments.

## THIRD CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Unlawful Civil Detention*

129.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

34

130.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

131.    The government's detention of Dr. Khan Suri, prior to his pretrial release on bond on May 14, 2025, was wholly unjustified, as would be his re-detention on the same basis. The government has not demonstrated that Dr. Khan Suri—a husband to a U.S. citizen, a father of three young children, and with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Dr. Khan Suri cannot be safely released back to his family.

132.    Moreover, Dr. Khan Suri's detention was punitive as it bore no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Policy and the Rubio Determination—is unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention [was] not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring). The same would be true of his re-detention on the same basis.

133.    The punitive nature of Dr. Khan Suri's detention was compounded by the degrading and harmful conditions in which he was confined: he had extremely limited access to recreation and contact with the outside world; he was initially denied the ability to practice his faith; he was forced to sleep on the floor of a TV room in an overcrowded dorm, deprived of all but a few hours of sleep; he was denied clean undergarments and adequate nutrition; and he was subjected, with

no valid basis whatsoever, to more severe restrictions and treatment than other detained individuals despite posing no danger to others.

## FOURTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment
### to the United States Constitution
### *Void for Vagueness*

134. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

135. The Policy and the Rubio Determination violate Dr. Khan Suri's right to due process. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

136. The government's policy of detaining, transferring to immigration jails in the South, seeking to deport, and terminating the SEVIS records and statuses of noncitizens who they perceive to hold views supportive of Palestinian rights or critical of Israeli or U.S. government policy based on those noncitizens' protected speech, imputed viewpoint, religion, or protected association is unconstitutionally vague.

## FIFTH CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States
### Constitution
### *Equal Protection*

137. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

138. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Federal Government from denying equal protection of the laws to all persons within

36

its jurisdiction, to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 201 (1995).

139. Respondents targeted Dr. Khan Suri for apprehension, detention, transfer, termination of SEVIS record and status, and deportation in part because of their discriminatory animus towards his wife's Palestinian origin and her connection to Palestine.

140. Respondents thereby intentionally discriminated against Dr. Khan Suri on account of the national origin of his wife, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

**SIXTH CLAIM**

**Violation of the Administrative Procedure Act and the *Accardi* Doctrine**
***Policy of Targeting Noncitizens***

141. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

142. The government has adopted a policy of targeting noncitizens for apprehension, detention, transfer, and removal based on First Amendment-protected speech advocating for Palestinian rights, imputed viewpoint, national origin, religion, and protected association. This policy, and its application to Dr. Khan Suri, is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, including its rules related to First Amendment protected activity and its rules related to transfers. *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

143. In addition, the Rubio Determination that Dr. Khan Suri's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious,

an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).

## SEVENTH CLAIM

### Violation of the Administrative Procedure Act
#### *SEVIS Termination*

144.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

145.    Under § 706 of the APA, the court shall hold unlawful and set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B).

146.    Respondents' actions in terminating Dr. Khan Suri's SEVIS record are arbitrary and capricious under § 706(2)(A). A final agency action is arbitrary and capricious if it fails to make a rational connection between the facts found and the decision made.

147.    Respondents failed to articulate the facts and relevant authority that provided a basis for their decision to terminate Dr. Khan Suri's SEVIS status in violation of the APA, let alone any rational connection between the facts found and the decision made.

148.    Respondents' termination of Dr. Khan Suri's SEVIS record is also not "in accordance with law" under § 706(2)(A). DHS and State Department regulations set out the exclusive bases under which the government is authorized to terminate an exchange visitor's J-1 status and SEVIS record, and visa revocation is not one of the permissible reasons.

149.    Respondents' actions are "contrary to constitutional right" under § 706(2)(B). Respondents terminated Dr. Khan Suri's SEVIS record in retaliation for his constitutionally

38

protected speech and association in violation of the First and Fifth Amendments to the Constitution.

150.    Accordingly, Respondents' actions violate the APA and should be held unlawful and set aside.

## EIGHTH CLAIM

### Continued Release on Bail Pending Adjudication

151.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

152.    Under 28 U.S.C. § 2241, federal district courts are granted broad authority, "within their respective jurisdictions," 28 U.S.C. § 2241(a), to hear applications for writs of habeas corpus filed by persons claiming to be held "in custody in violation of the Constitution or laws or treaties of the United States." *Timms v. Johns*, 627 F. 3d 525 (4th Cir. 2010).

153.    This petition raises numerous substantial constitutional and statutory claims challenging Dr. Khan Suri's retaliatory detention. Extraordinary circumstances exist that make Dr. Khan Suri's continued pretrial release essential for the remedy to be effective.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

a.    Assume jurisdiction over this matter;

b.    Enjoin Respondents from applying the unlawful Policy of targeting noncitizens for apprehension, detention, transfer, and status termination based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations to Petitioner;

c.  Declare the Respondents' Policy of targeting noncitizens for apprehension, detention, transfer, and status termination based on First Amendment-protected speech advocating for Palestinian rights, their actual or imputed viewpoint in support of Palestinian rights, or their actual or imputed religion, national origin, or protected associations is unlawful;

d.  If re-detained, order Respondents to transfer Petitioner back to the jurisdiction of this District pending these proceedings;

e.  Order the continued release of Petitioner pending these proceedings;

f.  Order the release of Petitioner;

g.  Declare that Respondents' actions to apprehend and detain Petitioner violate the First Amendment, the Due Process Clause of the Fifth Amendment, the Equal Protection protections of the Fifth Amendment, and the APA;

h.  Declare that Respondents' termination of Petitioner's SEVIS record and J-1 status violates his rights under the First and Fifth Amendments and the APA;

i.  Order Respondents to set aside their termination of Petitioner's and his children's SEVIS records;

j.  Order Respondents to reinstate, retroactive to March 18, 2025, Petitioner's J-1 exchange visitor status and his corresponding SEVIS record and Petitioner's children's J-2 status and corresponding SEVIS records;

k.  Enjoin Respondents from terminating Petitioner's SEVIS records and his children's SEVIS records pending these proceedings, unless Respondents become aware of a newly discovered, independent legal ground to terminate the records, and requiring Respondents to provide at least 21 days advance notice to Petitioner and his counsel

40

of any intent to terminate Petitioner or his children's SEVIS records based on newly discovered, independent legal grounds;

l.      Enjoin Respondents from directly or indirectly enforcing, implementing, or otherwise imposing any consequence, including adverse immigration action, arising out of the termination of Petitioner's or his children's SEVIS records or J-1 or J-2 status;

m.     Award reasonable attorneys' fees and costs for this action; and

n.      Grant such further relief as the Court deems just and proper.

Dated: June 30, 2025                          Respectfully submitted,

                                              /s/*Eden B. Heilman*


Hassan Ahmad (VSB No. 83428)                  Eden Heilman (VSB No. 93554)
THE HMA LAW FIRM, PLLC                        Sophia Leticia Gregg (VSB No. 91582)
6 Pidgeon Hill Dr, Suite 330                  Geri Greenspan (VSB No. 76786)
Sterling, VA 20165                            Vishal Agraharkar (VSB No. 93265)
(703) 964-0245                                AMERICAN CIVIL LIBERTIES UNION
hma@hmalegal.com                              FOUNDATION OF VIRGINIA
                                              701 E. Franklin St., Suite 1412
Diala Shamas*                                 Richmond, VA 23219
Astha Sharma Pokharel*                        (804) 644-8022
Samah Sisay*                                  eheilman@acluva.org
Baher Azmy*                                   sgregg@acluva.org
CENTER FOR CONSTITUTIONAL RIGHTS              vagraharkar@acluva.org
666 Broadway, 7th floor                       ggreenspan@acluva.org
New York, NY 10012
(212) 614-6464
dshamas@ccrjustice.org                        Scarlet Kim*
asharmapokharel@ccrjustice.org                Brian Hauss*
bazmy@ccrjustice.org                          Noor Zafar**
ssisay@ccrjustice.org                         Sidra Mahfooz**
                                              Michael K.T. Tan*
                                              Brett Max Kaufman*
Jessica Myers Vosburgh*                       AMERICAN CIVIL LIBERTIES UNION
CENTER FOR CONSTITUTIONAL RIGHTS                  FOUNDATION
P.O. Box 486

41

Birmingham, AL 35201
(212) 614-6492
jvosburgh@ccrjustice.org

Nermeen Saba Arastu*
IMMIGRANT & NON-CITIZEN RIGHTS CLINIC
MAIN STREET LEGAL SERVICES, INC.
CUNY SCHOOL OF LAW
2 Court Square, 5th Floor
Long Island City, NY 11101
(202) 246-0124
Nermeen.arastu@law.cuny.edu

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
bhauss@aclu.org
nzafar@aclu.org
smahfooz@aclu.org
m.tan@aclu.org
bkaufman@aclu.org

*Admitted pro hac vice
** Pro hac vice application forthcoming

Counsel for Petitioner

## **VERIFICATION**

I, Badar Khan Suri, declare as follows:

1. I am the Petitioner-Plaintiff in the above-captioned case, and a resident of the Commonwealth of Virginia.

2. I have personal knowledge of my activities as described in the foregoing Second Amended Petition for Writ of Habeas Corpus and Complaint, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States that the factual statements in this Second Amended Petition and Complaint concerning myself and my activities are true and correct to the best of my knowledge.

Dated: June 20, 2025

_____

Badar Khan Suri

## <u>CERTIFICATE OF SERVICE</u>

I, Geri Greenspan, hereby certify that on this date, I uploaded a copy of Petitioner's Second Amended Petition for Writ of Habeas Corpus and Complaint and any attachments using the CM/ECF system, which will cause notice to be served electronically to all parties.

Date: June 30, 2025

Respectfully submitted,

/s/ *Geri Greenspan*
Geri Greenspan, VSB No. 76786
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
Tel: (804) 523-2152
ggreenspan@acluva.org